
# ARKANSAS COURT OF APPEALS

DIVISION II

No. CV-17-330

| | |
|---|---|
| THOMAS G. WATSON<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered: September 27, 2017<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FJV-14-9]<br><br>HONORABLE ANNIE HENDRICKS, JUDGE<br><br>AFFIRMED |

## DAVID M. GLOVER, Judge

Thomas Watson appeals the Sebastian County Circuit Court's order terminating his parental rights to his daughter, J.W., born September 13, 2006.[1] He argues the trial court erred in terminating his parental rights because the Arkansas Department of Human Services (DHS) failed to prove termination was in J.W.'s best interest. We affirm.

In January 2014 DHS filed a petition for emergency custody and dependency-neglect on J.W. and J.R.1.[2] A seventy-two-hour hold was placed on the children after Autumn Watson (J.W.'s mother) and Jerry Rogers (Autumn's boyfriend) were arrested on various drug charges and a child-endangerment charge at the home where they lived together.

---

[1]The parental rights of J.W.'s mother, Autumn Watson, were also terminated in this order as to J.W. and J.W.'s half-siblings, J.R.1 and J.R.2, but she is not a party to this appeal.

[2]J.R.2 was not yet born.

Watson was identified as J.W.'s father, but his address was unknown. An ex parte order granting DHS custody was entered on January 6, 2014. A probable-cause order was filed on January 24, 2014, continuing custody of the children with DHS; Watson was not present at the hearing, but the order stated it was believed he was on parole and living in Fort Smith, Arkansas. Watson's mother, Melissa Watson, was present at the probable-cause hearing, and DHS was directed to explore the appropriateness of placing the children with her as a temporary placement option.[3]

The children were adjudicated dependent-neglected in an order filed April 9, 2014. Watson was present at this hearing, having been transported to the hearing from the Sebastian County Adult Detention Center. In that order, the circuit court noted Watson's extensive criminal record, as well as the fact he was a fugitive from justice at the time of J.W.'s removal from Autumn. The circuit court refused to award Watson visitation due to his incarceration; ordered Watson to notify DHS when he was released from incarceration and to provide his contact information; and directed Watson to resolve all criminal charges and comply with the terms of his criminal sentences.

In a review order filed on August 19, 2014, the circuit court noted Watson was in prison on a parole revocation. That order instructed Watson to comply with the rules at the facility where he was housed so that he did not incur disciplinary actions that prolonged incarceration; to notify DHS upon his release so a staffing could be scheduled to assess his

---

[3]Autumn was still married to Watson; because they were married, Watson was named as J.R.1's legal father although Autumn identified Rogers as J.R.1's biological father because Rogers had not established paternity at that time.

need for services; to avail himself of all self-help services during incarceration; and to comply on release with all terms and conditions of his release. The circuit court ordered Watson to have no contact with J.W. until approved by DHS following a staffing.

A second review hearing was held on August 20, 2014, and in an order filed October 29, 2014, the circuit court found that the juveniles had begun a trial home placement with Autumn Watson on June 19, 2014, the children were doing well in that trial placement, and it was in their best interest to return custody to Autumn effective August 20, 2014. Watson was incarcerated at the time of this review hearing. The circuit court ordered him to have no contact with J.W. until approved by DHS; to remain clean and sober; to submit to random drug screens; to comply with the terms of his criminal sentence; and to comply with the terms and conditions of his release from incarceration.

A second petition for emergency custody and dependency-neglect was filed on January 26, 2015, after custody had been returned to Autumn.[4] In this petition, Watson, who was still married to Autumn, was stated to be J.W.'s father and believed to be the legal father of J.R.1 and J.R.2. The affidavit attached to the petition alleged that the three children were removed from Autumn's custody on January 21, 2015, on a seventy-two-hour hold because she allowed Rogers to reside with her in contravention of court orders, as well as Michael Smith, a parolee who was wanted in connection with a stabbing and robbery in Oklahoma, and because drug paraphernalia and unmarked pill bottles were in

---

[4]J.R.2 was born on June 10, 2014. Rogers was alleged to also be J.R.2's biological father. Genetic testing revealed Rogers is, in fact, the biological father of both J.R.1 and J.R.2.

the house. An ex parte order granting emergency custody to DHS was entered the same day. A probable-cause order was filed on March 13, 2015, continuing custody of the juveniles with DHS, noting that the whereabouts of Watson were unknown and that Watson was still legally married to Autumn and was therefore the legal father of all three children, with Jerry Rogers being the putative father of J.R.1 and J.R.2. A review hearing was held on July 8, 2015, continuing custody with DHS; the goal of the case continued to be reunification with Autumn, with a concurrent goal of adoption. The parents were ordered to obtain and maintain stable housing, employment, income, and transportation; to submit to random drug screens; to get clean and sober and remain so; to notify DHS of any significant changes or events; to resolve any outstanding criminal matters; and to keep DHS apprised of current contact information. The circuit court found that Watson had not complied with the case plan or with prior court orders, and it refused to allow him contact with J.W. until he appeared before the court and was assessed for services.

A permanency-planning hearing was held on December 2, 2015. In an order filed on May 18, 2016, the circuit court continued custody with DHS and changed the goal of the case to adoption. Watson was not present at this hearing; the circuit court noted he had not complied with the case plan or with prior court orders.

A petition for termination of parental rights was filed on May 4, 2016. As for grounds to terminate parental rights as to Watson, it was alleged that (1) as a noncustodial parent, and despite a meaningful effort by DHS to rehabilitate him and correct the conditions that prevented J.W. from being safely placed in his home, the conditions had not been remedied; (2) Watson had abandoned J.W.; (3) other factors arose subsequent to the filing of the

petition for dependency-neglect that demonstrate the placement of J.W. in Watson's custody was contrary to her health, safety, and welfare; (4) Watson had been sentenced in a criminal proceeding for a period of time that would constitute a substantial period of J.W.'s life; and (5) Watson had subjected J.W. to aggravated circumstances, as there was little likelihood that services to the family would result in a successful reunification. It was further alleged that it was in the best interest of J.W. for parental rights to be terminated.

A review hearing was held on May 18, 2016; Watson was present, having been transported from the Arkansas Department of Correction for the hearing. By agreement of the parties, Watson and his attorney were served with copies of the petition for termination in open court and waived all further service of process. The review order stated that the goal of the case was adoption, noting Watson had been incarcerated off and on throughout the pendency of the case, and during the times of his release, his whereabouts would remain unknown until his next arrest; Watson had not complied with the case plan or court orders when he was not incarcerated; and the three children were in a kinship placement with J.W.'s paternal grandfather.

The circuit court entered an order on January 25, 2017, terminating the parental rights of Watson, Autumn Watson, and Rogers. As to Watson, the circuit court granted termination of his parental rights on all five bases alleged in DHS's petition for termination of parental rights. As to best interest, the circuit court found the children were adoptable and would be at risk of physical and psychological harm if returned to Watson due to his long periods of incarceration, multiple convictions, long-standing criminal abuse, and/or criminal activity. Furthermore, the circuit court found Watson had failed to show any

SLIP OPINION

inclination or ability to develop a lifestyle that would provide safety or stability for a child; he had not had any significant contact with J.W. in years; and there was no evidence he had appropriate housing, employment, income, or transportation.

Melissa Dancer, the primary caseworker, testified at the termination hearing. She stated that Watson was incarcerated when the children were first taken into DHS custody, and while he had been incarcerated on several occasions during the case, she had "absolutely no interaction" with him during the times he was out of prison because he never contacted her; and she was unaware of any evidence Watson could be successfully reunified with J.W. during a reasonable period of time if provided with additional time or services. Dancer testified J.W. would be at risk of potential harm if returned to Watson's custody due to his criminal history and the activities in which Watson engaged on release from prison. She further expressed that she believed J.W. was adoptable; that all three children were placed together; and that the foster parents had stated a desire to adopt all three children had been if they became available. Dancer testified J.W. never asked her for visits with Watson.

Watson testified that he was currently in prison on a parole violation, but he was "flattening [his] time out" at the end of November 2017. He asserted that while he was out of prison, he had contact with J.W. "all the time"; that he paid child support, just not through the court, as he was not legally obligated to pay child support because he was still married to Autumn; that he was unable to provide for J.W. while he was incarcerated; but that when he got out of prison, his plans were to finish his degree, finish barber college, and obtain his barber license. Watson said he knew he had made mistakes, but he believed it

SLIP OPINION

was in J.W.'s best interest for his parental rights not to be terminated and for the children to be placed with his family.[5]

*Sufficiency of Evidence*

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the children. *Norton v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 285. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juveniles will be adopted and of the potential harm caused by returning custody of the children to the parent. *Id.* Each of these requires proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. *Id.*

Appellate review of termination-of-parental-rights cases is de novo, and our inquiry on appeal is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Wallace v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 376, ___ S.W.3d ___. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the clearly erroneous question, a high degree of deference is given to the circuit court, as it is in a far superior position to observe the parties before it and to judge the credibility of witnesses. *Id.*

---

[5]During closing arguments, DHS counsel clarified that Watson's parents were the foster parents of all three children, but they did not have custody of the children.

Watson does not contest the grounds found by the circuit court for termination of his parental rights, nor does he challenge the adoptability aspect of the best-interest analysis. He challenges only the potential-harm finding. The circuit court was not required to find that actual harm would occur if the child was returned to the parent, nor was it required to affirmatively identify a potential harm. *Miller v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 396, ___ S.W.3d ___. Evidence regarding potential harm must be viewed in a forward-looking manner and considered in broad terms; past behavior may be considered as a predictor of potential harm that may likely result if the child were returned to the parent's care and custody. *Wallace, supra.*

Watson cites *Cranford v. Arkansas Department of Human Services*, 2011 Ark. App. 211, 378 S.W.3d 851, in support of his argument that the circuit court erred in finding J.W. would suffer potential harm if returned to him. However, there are factual differences between the present case and *Cranford*.

In *Cranford*, the maternal grandparents had custody of the child, and the grandmother testified she wanted the child to have continued contact with his parents, as she believed this was in his best interest. The parents in *Cranford* were making strides toward becoming better parents. Here, the paternal grandparents did not have custody of J.W.; rather, they were her foster parents, and they had expressed an interest in adopting J.W. and her half-siblings. Furthermore, unlike the parents in *Cranford*, Watson was not making progress in becoming a better parent for J.W., as evidenced by his lack of involvement during the pendency of this case. At the termination hearing, Watson was still incarcerated and would remain in prison until at least November 2017. Furthermore, one of the bases on which

the circuit court terminated Watson's parental rights was that he had subjected J.W. to aggravated circumstances; specifically, there was little likelihood that services to the family would result in a successful reunification. Watson did not appeal this ground to support termination of his parental rights.

Watson's case is more akin to *Brumley v. Arkansas Department of Human Services*, 2015 Ark. 356. As in *Brumley*, Watson has been incarcerated for much of J.W.'s life, and other than his own self-serving testimony, there was no evidence Watson had a relationship with his daughter. As in *Brumley*, the stability and reasonable hope of reunification found in *Cranford* is clearly lacking in the facts of the present case. Permanency is the objective of termination proceedings, and it cannot be lightly discounted. *Brumley*, *supra*. This evidence of potential harm, coupled with the circuit court's unrefuted finding that J.W. is adoptable, supports the circuit court's ruling that termination of Watson's parental rights is in J.W.'s best interest.

Affirmed.

VIRDEN and MURPHY, JJ., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee Arkansas Department of Human Services.