RAYMOND R. ABRAMSON, Judge
Misty Lawrence appeals the Greene County Circuit Court order terminating her parental rights to her daughter, F.R. On appeal, Lawrence argues that the circuit court erred by (1) not complying with the notice provision of the Indian Child Welfare Act (ICWA); (2) terminating her parental rights based on grounds not pled in the amended petition; and (3) finding that it is in F.R.'s best interest to terminate her parental rights. We affirm.
On March 11, 2016, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect concerning F.R. The petition listed Lawrence as the mother and Joshua Richer[1] as the putative father. In the affidavit attached to the petition, DHS stated that it had received a report from the hospital where F.R. was born that Lawrence could not adequately care for the child. Specifically, a nurse reported that the nursing staff had been feeding *194 F.R. more than Lawrence and that Lawrence had been talking to herself and had scabies. Lawrence admitted that she had had her rights terminated to two other children due to her mental instability. DHS visited Lawrence's duplex and found it inappropriate for the child. The court entered an ex parte order for emergency custody the day the petition was filed.
On March 16, 2016, the court entered a probable-cause order. In the order, the court included the following:
The mother does/does not have membership in or descent from an Indian Tribe; the legal/putative father does/does not have membership in or descent from an Indian tribe; the juvenile does/does nothave membership in or descent from an Indian tribe.
The phrase "does not" appears to be scratched through.
On May 12, 2016, the court adjudicated F.R. dependent-neglected based on both inadequate supervision due to Lawrence's failure to feed the child as directed and concerns about her mental health. The adjudication order also contains the language concerning the "legal/putative father['s]" relationship to an Indian tribe; however, a line is not drawn through "does not."
On September 26, 2016, the court entered a review order. The court found that Lawrence had partially complied with the case plan. The court noted a primary concern had been environmental neglect and that Lawrence's home still had "a strong odor of animal urine." The court ordered Lawrence to have supervised visitation at the DHS office for one hour or more.
On March 6, 2017, the court entered a permanency-planning order. The court found that Lawrence had complied with the case plan but had not made substantial, measurable progress. The court changed the goal of the case to adoption with DHS filing a petition for termination of Lawrence's parental rights. The court continued Lawrence's visitation with F.R. for one hour every two weeks.
On April 12, 2017, DHS filed a petition for termination of parental rights. DHS alleged the failure-to-remedy ground,[2] subsequent-factors ground,[3] and aggravated-circumstances ground.[4] About twenty minutes after DHS had filed its original complaint, DHS filed an amended petition for termination of Lawrence's parental rights. In the amended petition, DHS stated,
1. The Department filed a petition to terminate parental rights on April 12, 2017. The Certificate of Service on that petition did not have a date or signature.
2. This amended petition is for the sole purpose of correcting the certificate of service on the original petition. The original petition's certificate of service shall be amended to look exactly as the certificate of service on this petition below.
On May 15, 2017, the court held a termination hearing. Kim Bliss, a family-service worker, testified that she had visited Lawrence at the hospital after F.R.'s birth, and Lawrence told Bliss that she talked to herself on some occasions. Lawrence explained that she talked to herself because having F.R. was stressful. Lawrence further told Bliss that she had been on medications but that she was no longer taking them and that she had scabies because she forgot to bathe. Lawrence also reported to Bliss that her home was not clean but that she could clean it up. Bliss testified that she visited Lawrence's home the next *195 morning and that the home had roaches, dirty dishes, trash, food, and screws and nails "all over the place." Bliss noted that Lawrence had a baby bed and baby "stuff" for F.R.
Bliss stated that during the pendency of the case, Lawrence had watched "The Clock is Ticking" video, maintained stable housing and employment, completed her parenting classes and psychological referral, and visited F.R. However, she stated that Lawrence had not completed the recommendations of her psychological referral and had not improved her home. As to the psychological recommendations, Bliss testified that they included that Lawrence comply with medication management and mental-health services. She explained that Lawrence had not consistently taken her medication and had frequently missed her therapy appointments. She discussed an incident in October 2016 when Lawrence was not taking her medication. Specifically, Lawrence had a fight with Richer, threatened to take a bottle of pills, and cut herself in the leg with a knife. Lawrence was arrested for disorderly conduct and went to the hospital for the gash in her leg, where she received staples.
Bliss testified that Lawrence had several animals living in her duplex and that the duplex had a strong odor of ammonia. She stated that the duplex also was infested with bed bugs, fleas, roaches, and mice. She testified that Lawrence removed the dog that had the worst urinary incontinence problem in November 2016 but that in March 2017, a family with two cats moved into Lawrence's duplex. Bliss stated that she most recently visited Lawrence's duplex on May 8, 2017, and that Lawrence had only two dogs living there. She further testified that it was clean but still had roaches, even after DHS provided Lawrence with roach repellent. She further testified that Richer had moved out of the duplex in December 2016 and that Lawrence's new boyfriend, Peter Carter, had moved in in January 2017. She testified that she gave Carter paperwork to complete a nationwide-maltreatment-registry search in January 2017, but he delayed completing the paperwork until May 5, 2017, and the results can take six to eight weeks. She noted that Carter has a history with DHS in Missouri, but the Missouri office cannot release the records without Carter's consent, and Carter refused to sign a consent form.
As to F.R., Bliss testified that she is doing well and that she is bonded to her foster parents. She stated that F.R.'s foster parents are committed to adopting F.R. if Lawrence's rights are terminated. She testified that when Lawrence visits the child, F.R. cries almost the entire visit. She stated that Lawrence tries to console and distract F.R. but that the child prefers her foster parents. She noted that Lawrence often brings F.R. appropriate clothing, and during the visitations, she feeds the child. She stated that Lawrence had fed F.R. inappropriately and that she had to instruct Lawrence on proper feeding practices, but Lawrence had listened and had modified her practices.
Ryan Vaughan, a CASA worker, testified that he visited Lawrence's duplex and that during his initial visits, the home was "really messy" and had a strong ammonia smell. He noted the cleanliness of the duplex fluctuated. He explained that the condition of the duplex had improved in January 2017 after Richer moved out and when Carter moved in. However, in April 2017, the duplex was at its worst when the visiting family moved into the duplex. He also voiced concern about Lawrence's psychological abilities and discussed the incident when Lawrence cut herself. He stated that Lawrence is inconsistent.
*196 Brittany White, a mental-health professional, testified that she had weekly counseling appointments with Lawrence. She stated that Lawrence had intermittently missed several appointments but that Lawrence was consistent in attending the sessions. She testified that Lawrence is prescribed an antidepressant, a sleeping medication, and an anxiety medication. White noted that both the antidepressant and sleeping medication were prescribed on an as-needed basis. She believed Lawrence could follow directions to care for a baby. She had observed one supervised visitation between Lawrence and F.R., and she believed that Lawrence did not pose a risk to the child. She further believed that Lawrence could care for F.R. on her own if she had consistent support.
Following DHS's case, Lawrence's attorney moved for a directed verdict. She asked the court to dismiss the case because DHS's amended petition for termination of Lawrence's parental rights failed to allege any grounds for termination and did not incorporate the original petition. The court denied the motion.
Thereafter, Peter Carter testified on Lawrence's behalf. He stated that he had lived in Lawrence's duplex since January 2, 2017, but that they hoped to move in the future. He explained that they had delayed moving because they did not want to appear unstable to the court. He noted his sixteen-year-old son, J.C., also lives with them. He testified that Lawrence's cousins had previously lived with them for a month in April, but the cousins had moved out and are moving into the duplex next to them. He noted that the cousins included a husband and wife and their three children. He testified that he and Lawrence have one dog and that the cousins' cat still lives with them until the cousins move into the new duplex. Carter testified that he is disabled and draws $785 a month in disability benefits.
As to the condition of the duplex, he testified that the ammonia smell had not been an issue since February 2017. He noted that he is a smoker but stated that he now smokes only outside at DHS's direction. He explained that they have roaches and bed bugs but that the duplex became infested when the landlord removed the carpets from their neighbor's duplex. He testified that they had tried to get rid of the bugs but that they had been unsuccessful and that it continues to be a problem. He noted that DHS merely gave them one bottle of Raid.
Carter further testified that he did not receive any paperwork from DHS concerning backgrounds checks until March. He noted that after he had received the paperwork, he completed it and submitted it to DHS. He further denied refusing to sign a consent form and stated that he is willing to sign the form so that DHS may contain the Missouri DHS records.
Patty Brewer testified that she is the coordinator of ArkStart, a program that works with individuals with developmental disabilities and mental-health issues, and that she had visited Lawrence's home for one hour for each of the past eighteen months. Brewer described the home as in "good condition" and clean. She did not notice an odor or a pest infestation. She further testified that she had seen Lawrence interact with children, and she believed the interaction was appropriate. She did not have any concerns about the children's safety.
Following the testimony, the court orally ruled to terminate Lawrence's parental rights. On June 9, 2017, the court entered a written termination order. The court found that the failure-to-remedy ground, subsequent-factors ground, and aggravated-circumstances ground supported termination.
*197 The court further found it is in F.R.'s best interest to terminate Lawrence's parental rights. The court stated as follows:
In making this finding, the Court specifically considered the likelihood that the juvenile will be adopted if the termination petition is granted and the potential harm on the health and safety of the juvenile caused by returning the juvenile to the custody of Misty Lawrence. The Court finds that it would be harmful to return a child to a mother that lacks parenting skills and the ability to obtain them, that has psychological issues that Misty Lawrence has, and that is unwilling or incapable of keeping an environmentally safe home. The court has to be concerned that Ms. Lawrence testified that she was angry and got a knife during an altercation with Mr. Richer. Further, Ms. Lawrence has had criminal trouble subsequent to the removal of the child.
Lawrence timely appealed the termination order to this court. She raises three arguments on appeal.
We review termination-of-parental-rights cases de novo. Lively v. Ark. Dep't of Human Servs. , 2015 Ark. App. 131, 456 S.W.3d 383. It is DHS's burden to prove by clear and convincing evidence that it is in a child's best interest to terminate parental rights as well as the existence of at least one statutory ground for termination. Id. On appeal, the inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. Id. We give a high degree of deference to the circuit court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. Id.
We first address Lawrence's argument concerning ICWA. She argues that the circuit court erred by failing to comply with the notice provision of ICWA after the court had specifically found in its probable-cause order that F.R.'s father, Richer, had a membership in or descent from an Indian tribe. She claims that the circuit court made this finding because the probable-cause order includes the following statement: "the legal/putative father does/does not have membership in or descent from an Indian tribe." There is no other information in the record concerning Richer's relationship to an Indian tribe.
However, Lawrence failed to raise the ICWA issue to the circuit court, and it is therefore not preserved for our review. Adams v. Ark. Dep't of Human Servs. , 2016 Ark. App. 131, 485 S.W.3d 275 ; Lauman v. Ark. Dep't of Human Servs. , 2010 Ark. App. 564. Lawrence acknowledges that she failed to preserve the issue but asks this Court to revisit our prior rulings on preservation as it applies to ICWA. We decline to do so in this case.
Lawrence next argues that the circuit court erred by terminating her parental rights based on grounds not pled in the amended petition. She points out that the amended petition did not allege any statutory grounds for termination and that it did not adopt and incorporate the original petition that alleged the failure-to-remedy, subsequent-factors, and aggravated-circumstances grounds. Because it did not incorporate the original petition, she contends that the amended petition supersedes the original petition and cites McMullen v. McHughes Law Firm , 2015 Ark. 15, 454 S.W.3d 200, and Farmers Union Mutual Insurance Co. v. Robertson , 2010 Ark. 241, 370 S.W.3d 179. She asserts that a decision to terminate parental *198 rights cannot rest on grounds that were not pled. Thus, she argues that the circuit court should have granted her motion to dismiss the petition on that basis.
While Lawrence relies on McMullen and Farmers to support her argument, her claim is one of due process. This court will not affirm a termination of parental rights based on grounds that were not pled because it would result in a violation of the parent's due-process rights. See, e.g. , Jackson v. Ark. Dep't of Human Servs. , 2013 Ark. App. 411, 429 S.W.3d 276. We have reasoned that when DHS does not specifically inform the parent that a ground is being alleged, the parent is not placed on notice that she must defend herself on that particular ground. Id.
In this case, we hold that the circuit court did not err in denying Lawrence's motion to dismiss. Lawrence cannot claim that she did not have notice that DHS sought to terminate her parental rights based on the failure-to-remedy, subsequent-factors, and aggravated-circumstances grounds. DHS pled all three grounds in its original petition; in the amended petition, DHS specifically stated that the petition was filed "for the sole purpose of correcting the certificate of service on the original petition." And the amended petition was filed only twenty minutes after the original petition had been filed. Further, Lawrence had the opportunity to defend herself against those grounds. Her attorney moved for a directed verdict on all three grounds and also argued against them in closing arguments. Thus, she was not denied the opportunity to defend herself against the allegations. Moreover, she did not raise a due-process violation to the circuit court. Because no specific due-process argument was made below, this point is not preserved for our review. Kohlman v. Ark. Dep't of Human Servs. , 2018 Ark. App. 164. Accordingly, under these unique circumstances, we hold that the circuit court did not err in denying Lawrence's motion to dismiss.
Lawrence lastly argues that the circuit court erred in finding that it was in F.R.'s best interest to terminate her parental rights. The best-interest analysis includes consideration of the likelihood that the children will be adopted and the potential harm caused by returning custody of the children to the parent. Spencer v. Ark. Dep't of Human Servs. , 2013 Ark. App. 96, 426 S.W.3d 494. The court, however, does not have to determine that every factor considered be established by clear and convincing evidence. Caruthers v. Ark. Dep't of Human Servs. , 2017 Ark. App. 230, 519 S.W.3d 350. Instead, after considering all the factors, the evidence must be clear and convincing that the termination is in the best interest of the child. Reid v. Ark. Dep't of Human Servs. , 2011 Ark. 187, 380 S.W.3d 918.
Here, Lawrence does not challenge the circuit court's adoptability finding. She argues only that the court erred in finding that F.R. would be at risk of potential harm if returned to her custody. She asserts that the circuit court completely ignored the testimony regarding her improvements throughout the case. She points out that her therapist testified that she had the capability to parent F.R. and that she took direction well. She further claims that the testimony showed the condition of her home had improved.
We hold that the circuit court did not clearly err in determining that F.R. would be at risk of harm if returned to Lawrence's custody. Even though there was testimony that Lawrence had made improvements throughout the case, the court found that it would be harmful to return F.R. to Lawrence's custody based on her lack of parenting skills, her mental *199 health, and her inability to keep an environmentally safe home. There is evidence to support these findings. Specifically, after F.R. had been removed from her custody, Lawrence was arrested for disorderly conduct after she cut herself during a fight with F.R.'s father. Further, Lawrence's home was in its worst condition in April 2017, just a month before the termination hearing. Moreover, Lawrence needed specific directions on how to properly care for F.R. Accordingly, we are not left with a definite and firm conviction that the court made a mistake in finding that it is in F.R.'s best interest to terminate Lawrence's parental rights. Accordingly, we affirm.
Affirmed.
Virden and Whiteaker, JJ., agree.

DHS also filed a petition for termination of Richer's parental rights. However, he was not served with the petition; thus, the circuit court did not terminate his rights in the termination order.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Supp. 2017).

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) .

Ark. Code Ann. § 9-27-341(b)(3)(B)(xi).