WAYMOND M. BROWN, Judge
Appellants filed separate briefs appealing from the circuit court's order terminating their parental rights to W.W., born 10/11/2008; J.L., born 07/25/2013; and A.L., born 01/20/2017. On appeal, Christopher argues that the circuit court erred in (1) failing to timely appoint counsel to represent him and (2) finding that the grounds pleaded in support of termination were sufficiently proved. Laura[1] argues on appeal that the circuit court erred in terminating her rights to the children based on the (1) twelve-months-out-of-the-home-without-remedy ground and the (2) other-subsequent-factors ground. We affirm.
Appellee Arkansas Department of Human Services (DHS) initiated contact with appellants on December 3, 2015, after receiving a hotline report of environmental neglect, drug use, domestic violence, the children being "filthy[,]" and lack of food. Family services worker (FSW) Katie Wells made contact on the same date; she found adequate food and observed no health or safety concerns. Appellants denied drug use, domestic violence, and a lack of food. Unsuccessful attempts to visit appellants were made on January 4 and 6, 2016, but a successful attempt was made on January 11, 2016. Again, there was adequate food and no health or safety concerns were found; however, appellants both refused drug screens. Because the hotline report could not be substantiated, the case was closed on January 13, 2016.
A second hotline report was accepted on February 9, 2016, as "Differential Response with the allegations of environmental neglect and inadequate food." The report specifically stated that "there was no heat in the home and it had been snowing in Corning for the past two days and the wind chill was 18 ... [and W.W.] was filthy and dirty and had a body odor." When Wells made contact with appellants on February 10, 2016, she observed that the gas line had been cut-the landlord was supposed to be fixing it-so space heaters were being used and the bathroom was "very dirty." Laura refused cleaning supplies offered by Wells and said she understood that W.W. had to be bathed nightly.
Wells returned on February 17, 2016, to a "neat and clean" home with "[n]o health or safety concerns observed"; Laura affirmed that W.W. was taking baths nightly. Despite a hiccup on February 19, 2016, that was virtually duplicative of Wells's February 10 visit but which was corrected when Wells visited a second time on the *487 same date-the differential-response case was closed on February 19, 2016.[2]
DHS received a third hotline report on April 6, 2016. After receiving a call from a "concerned citizen" about the family, Corporal Smith went out to the home for a probation search.[3] Upon Corporal Smith's arrival, Christopher fled and Corporal Smith found Laura in the home "severely under the influence of methamphetamine[,]" so much so that he had to change J.L.'s diaper-which was "soiled and swinging between his legs"-after Laura "fidgeted" in her attempt to change him but was ultimately "unable to complete the task." Corporal Smith stated that "the home was not appropriate for the children due to the home being cluttered with trash and furniture and there was a roach infestation. He stated there was not food in the home and that [W.W.'s] clothing was filthy."
When Wells met Laura and the children at the police station, Laura was "swaying her head from side to side, gagging, and fidgeting" and was "unable to carry on a conversation ... due to being under the influence." Wells went to the home and essentially confirmed what Corporal Smith had reported, among other things such as a kitchen sink "overflowing with dirty dishes" and various types of debris obscuring the floor from view. A seventy-two-hour hold was taken on April 6, 2016. DHS filed a petition for emergency custody and dependency-neglect of W.W. and J.L. on April 8, 2016. The circuit court entered an ex parte order for emergency custody on the same date finding:
[DHS] has been involved with the family since 12/3/15, and that the following services, as outlined in the affidavit, were provided to the family: home visits, drug screens, offer of cleaning supplies, differential response case which was closed 12/19/1[5].[4] These services did not prevent removal because on 4/6/16, the mother was severely under the influence of methamphetamine and was arrested during a probation check at the home, and there was no caregiver for the children.
The circuit court entered a probable-cause order on April 12, 2016, following a hearing on the same date for which neither Christopher nor Laura was present. Finding that probable cause existed and continued for the children's removal, the goal of the case was reunification. Both parents were awarded supervised visitation.
The circuit court entered an adjudication order on June 10, 2016. Again, neither parent was present. The children were adjudicated dependent-neglected due to environmental neglect and parental unfitness. The goal of the case was reunification with a concurrent plan of adoption.
The circuit court entered a review order on September 21, 2016. Christopher appeared in court for the first time at the review hearing.[5] The order noted that the circuit court accepted and approved the stipulation of the parties and made the findings and orders contained therein based on said stipulations.[6] Regarding the *488 parties' compliance, the circuit court made the following findings:
The mother has partially completed parenting classes. The mother has completed 3 sessions of parenting classes, but has cancelled multiple sessions. The mother did not attend her psychological evaluation. The mother stated to the worker that she did not go to her psychological appointment due to feeling funny and that she just could not go. Due to her missing the appointment the mother's psychological evaluation is scheduled for December 2016. The mother missed several visits with her children. In addition, the mother tested positive for illegal substances. The parents' home continues to be cluttered and dirty.
....
The father has completed one parenting class. The father has cancelled multiple parenting sessions. The father did submit to a drug and alcohol assessment. However, the father has failed to follow the recommendation of inpatient substance abuse treatment. In addition, the father continues to test positive for illegal substances. The father has missed several visits with the children. The father states he is too tired from[7] working to attend the visitation sessions. The parents continue to have a cluttered and dirt [sic] home.
Accordingly, both parents were found to be in partial compliance with the case plan.
DHS filed a petition for emergency custody and dependency-neglect of A.L. on January 25, 2017, following her January 20, 2017 birth. A hotline report had been made stating that Laura had given birth to A.L. at home and that Laura was lying in her bed while A.L. was on the floor when the ambulance staff arrived. The affidavit in support stated:
FSWS Howard confirmed that Laura's older children, [W.W. and J.L.] are in foster care, and the permanency planning hearing is scheduled for March of this year. FSWS Howard reported that Laura has severe schizophrenia and will not consistently take medication. FSWS Howard reported that very little progress has been made throughout the foster care case currently opened on Laura's children; and [DHS] had planned to remove [A.L.] when born.
FSW [Allison] Swann contacted [Arkansas Methodist Medical Center] and spoke with RN Jennifer Melvoy. RN Melvoy told FSW Swann that Laura had contacted the ambulance upon giving birth to [A.L.] but when medical staff arrived, Laura could not figure out why she was bleeding.... RN Melvoy stated that Laura was also hospitalized for monitoring and it took her several hours of being in the hospital to understand that she had a baby and for a significant period of time, did not understand why she was bleeding. RN Melvoy explained that due to [A.L.] being born at home, she will be monitored for several days in the hospital[.]
The affidavit further noted DHS's involvement with Laura. A seventy-two-hour hold was taken on A.L. on January 20, 2017, though she remained in the hospital receiving antibiotics through January 24, 2017. An ex parte order for emergency custody was entered on January 25, 2017.
The circuit court entered a stipulated probable-cause order as to A.L. on January 26, 2017. Neither parent was present for the hearing, which was held on the same date. In its February 8, 2017 adjudication order, the circuit court adjudicated *489 A.L. dependent-neglected due to "Parental Unfitness and inadequate supervision as well as prior adjudication of siblings for the same grounds." Both parents were present at the adjudication hearing.[8] The goal of the case, as to A.L., was reunification with a concurrent plan of "relative placement, permanency and adoption."
Though the order-regarding W.W. and J.L. only-was not entered until September 20, 2017, the circuit court held a permanency-planning hearing on May 11, 2017. Both parents appeared, albeit Christopher appeared again by phone. The circuit court changed the goal of the case to adoption and authorized DHS to file a petition for termination of parental rights (TPR). Noting that Christopher had not yet been appointed counsel and was requesting such an appointment at that time, it found Christopher to be indigent and appointed him counsel. The circuit court specifically found that the appellants had not complied with the case plan, stating:
i. Christopher Lancaster, has been incarcerated and has not completed any case plan services. Specifically, Mr. Lancaster has not completed parenting, refused to attend inpatient drug treatment which was recommended at his drug and alcohol assessment, has not maintained meaningful contact with the children, and was sent back to prison due to methamphetamine residue been [sic] found in the home.
ii. Laura Wright [Lancaster], currently resides in an apartment in Corning, AR, however, the home is cluttered. In addition, [Laura] is struggling financially due to her fixed income from Social Security. [Laura] has also failed to maintain meaningful contact with the children. In this matter, the children came into care April 6, 2016 due to the mother having erratic behavior and was arrested during a probation check at the home, despite [DHS] offering the [sic] [Laura] services[.] [Laura] on March 22, 2017, tested positive for fentanyl. No proof of prescription provided to [DHS]. In addition, during this case, the mother gave birth to [A.L.], and [DHS] placed a 72-hour hold on the child, due to [Laura] giving birth at home without proper care of the infant, in that the infant was discovered lying on the floor by EMT's while [Laura] was in the bed and unaware she had given birth.
On May 31, 2017, DHS filed a petition to terminate the appellants' parental rights to all three children. With regard to W.W. and J.L., DHS asserted the twelve-months-out-of-custody-without-remedy ground[9] and the twelve-months-out-of-parents-custody-with-willful-failure-to-support ground.[10] It also asserted the other-subsequent-factors ground[11] against both appellants with regard to all three children and the criminal-sentence-constituting-substantial-period ground[12] against Christopher.[13]
Following a TPR hearing on September 20, 2017, the circuit court entered an order terminating the appellants' parental rights *490 to all three minor children on November 20, 2017. The circuit court found that DHS had proven the twelve-months-out-of-custody-without-remedy ground as to W.W. and J.L. only, stating that:
[J.L.] and [W.W.] were adjudicated dependent-neglected on June 20, 2016 due to environmental neglect and parental unfitness. Mrs. Howard today has testified that the house remained a significant issue up through the birth of [A.L.], who was born in the home. While the condition of the home has progressed, the progression has been recent. However, the Court notes it's [sic] overwhelming concern that [the] issue of parental unfitness continue [sic] to be an issue. Despite [DHS] offering services, the parents' unfitness is still an issue today.
The circuit court found that DHS also proved the other-subsequent-factors ground as to all three children, stating:
Subsequent to this case beginning: The mother has demonstrated an incapacity to be a parent to the children and despite services the mother has not remedied her incapacity; the mother has had failed drug screens, and has had pill counts that are inconsistent with the prescibied [sic] usage; the mother gave birth to [A.L.] in the home, and based on credible testimony, after the birth the mother was confused. The father became incarcerated and prior to his incarceration he had refused treatment.
This timely appeal followed.
Termination-of-parental-rights cases are reviewed de novo on appeal.[14] Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents.[15] DHS must prove by clear and convincing evidence that it is in the juvenile's best interest to terminate parental rights, as well as the existence of at least one statutory ground for termination.[16] Clear and convincing evidence is that degree of proof that will produce a firm conviction in the finder of fact regarding the allegation sought to be established; the question that must be answered on appeal, when the burden of proving a disputed fact in equity is by clear and convincing evidence, is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[17] A finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made.[18] However, a high degree of deference is given to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses.[19]
The goal of Arkansas Code Annotated section 9-27-341 is to provide permanency in a minor child's life in circumstances in which returning the child to the family home is contrary to the minor's health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the minor *491 child's perspective.[20] Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the children.[21] The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juveniles will be adopted and of the potential harm caused by returning custody of the children to the parent.[22] Each of these requires proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established.[23]
I. Christopher Lancaster
Christopher's first argument on appeal is that the circuit court erred in failing to timely appoint counsel to represent him.[24] Christopher failed to raise this due-process-violation argument to the circuit court. Accordingly, because no specific due-process argument was made below, this point is not preserved for our review.[25] This court notes, however, that while Christopher points this court to references to himself below as "legal father" in the caption of documents as well as in the findings in the circuit court's orders, it is not clear to this court whether appellants were ever married, though it appears that they were not.[26] Despite Laura's references to Christopher as her "husband" during her testimony and some references to Laura as "Mrs. Lancaster" during other witness testimony at the termination hearing, the circuit court alternates between applying a Wright and Lancaster surname to Laura throughout the case, and Christopher identified himself as single on his dependency-neglect affidavit of indigency at the time of the filing of the notice of appeal. Furthermore, Laura is not referred to with the Lancaster surname until the January 25, 2017 petition for emergency custody of A.L. If the appellants were not in fact married, having taken no action to establish paternity, there can be no assertion that appellant was the legal father of W.W. and J.L.,[27] and therefore *492 there can be no assertion of his right to counsel prior to the TPR hearing. If they were in fact married at the time of A.L.'s birth, then appellant's argument would have merit-as to A.L. only-if he had preserved it below, but this court finds that he failed to do so.
Christopher's second argument on appeal is that the grounds pled in support of termination were not sufficiently proved. He specifically argues that DHS failed to "prove that it offered appropriate family services, let alone engaged in meaningful efforts, in an attempt to strengthen the familial bond before it sought to terminate Christopher's rights." The circuit court found that DHS made reasonable efforts to prevent the children's removal in its June 20, 2016, and February 8, 2017 adjudication orders as well as in its January 26, 2017 stipulated probable cause order. It also found that DHS had made reasonable efforts to provide family services and to finalize permanent placement of the children with either appellant, but to no avail. These findings were in the circuit court's September 21, 2016 review order, its September 20, 2017 permanency-planning order, and its November 20, 2017 TPR order. A failure to challenge the court's prior "meaningful-efforts" findings precludes this court from now reviewing any adverse rulings resulting from those orders not appealed from.[28]
Christopher cites Sutton v. Arkansas Department of Human Services[29] for the assertion that his challenge to the lack of proof that DHS provided meaningful efforts or appropriate family services is properly before this court; however, Sutton is distinguishable. In Sutton , after quoting the directed-verdict motion of Sutton's counsel, this court declined to find that the issue had been waived by holding that Sutton's counsel appeared to be "arguing exactly what Sutton [was] arguing here-that the services provided were not meaningful." It was for that reason-that the argument was raised below, or at least began before the circuit court interrupted Sutton's counsel-that this court addressed the merits of Sutton's meaningful-services argument. Christopher's argument below, in total, was as follows:
I join with Ms. Jones. However, to my client, there was testimony that my client, the caseworker has not had any contact with my client in over a year, or roughly a year, since he's been incarcerated. He's had approximately, from the time the kids were removed to the adjudication-more specifically, from the adjudication to him being incarcerated in September, roughly three months to comply with the case plan.
He was making, I think, as the case worker said, a partial skin of his teeth perhaps compliance with the case plan. Expected to be released next month. So I also join in Ms. Jones' feeling that [DHS] that [DHS] has not met their burden by clear and convincing evidence that my client has not complied, Your Honor. So we join in the motion to-for directed verdict.
*493 Christopher simply did not make the specific meaningful-services argument below that he now makes before this court.
Even if he had made the specific argument he now makes-and we find that he did not-the record is clear that in the five months he was free,[30] appellant did very little to work his case plan, which included a drug-and-alcohol assessment and whatever services would be recommended by the assessment. In his testimony, Christopher "agreed that [he] completed very little of the [circuit court's] orders" during the time between the children coming into care in April 2016 and his becoming incarcerated in September 2016. Christopher's own counsel agreed that his actions were "partial [and by] the skin of his teeth." Christopher testified that "the day [he] went [to the assessment he] was offered services that very day to treat his drug addiction. [He] was not able to take advantage of that offer" because he "didn't have the money to take with him" to buy "clothes, have cigarettes, you know, [he] had to buy things to take with [him], you know." Accordingly, services were offered to treat his problem-a drug addiction which he struggled with given his positive drug screen during the pendency of the case before he was reincarcerated as well as his reincarceration itself for a drug-related offense-but he chose not to take advantage of the offer; Howard's testimony confirms this.
Christopher had been on parole for attempting to manufacture methamphetamines and-according to his own testimony-was again incarcerated at the time of the hearing due to parole violations of failing to report and having methamphetamines in his home. He admitted to having relapsed at the time the drugs were found in his home in September 2016, despite having done a "six-month treatment" while incarcerated in 2012. While a drug-and-alcohol assessment and treatment were not the only services offered to Christopher, they attempted to help him remedy his drug addiction-a major issue on his part and an impediment to custody of the children being returned to him. We hold that we cannot find that the circuit court erred in finding that the above-referenced grounds were proved as to Christopher. Accordingly, we affirm the circuit court on both of Christopher's points.
II. Laura Lancaster
Laura argues that there was not sufficient evidence to support the circuit court's finding that the twelve-months-out-of-the-home-without-remedy and other-subsequent-factors grounds were proven.[31] Regarding the twelve-months-out-of-the-home-without-remedy ground, Laura essentially argues that she could not prove that she could care for her kids because the caseworker would not let her: it was the caseworker's fault. She specifically argues:
[Laura] was not at liberty to have her children in the home and have expanded visits due to the fact that the caseworker had not allowed this to happen. [Laura] testified that she had requested to have more visits, but they had continued to be supervised. She testified further that she had requested another caseworker as she had a problem with the caseworker and by inference could not receive *494 more visits based on her problem with the caseworker.
....
[Laura] argues that this ground cannot be used against her because she did not cause her children's removal for a greater time of twelve months, that she disagreed that the children could not be placed with her on a trial placement or an expansion of visitation.... The fact that the caseworker chose not to place the children back with her was due to the caseworker's own opinion, as the services had been completed, the caseworker should have started a longer extension of visitation and placement in the home.
With this and the remainder of this argument, Laura asks this court to make a credibility determination that it will not make.[32] The circuit court's orders authorized visitation to Laura "at the discretion" of DHS and permitted approval of modification of visitation, to include unsupervised and overnight visitation, also at the discretion DHS, with approval from the attorney ad litem. Howard, as the caseworker, was DHS's representation in this case; her opinion was a determining factor. By finding and ruling as it did, the circuit court necessarily found Howard's testimony credible over that of Laura. Accordingly, we hold that the circuit court did not err in finding that DHS proved the twelve-months-out-of-the-home-without-remedy ground. Only one ground is necessary to terminate parental rights,[33] therefore we do not address appellant's argument regarding the second ground.
Affirmed.
Abramson and Harrison, JJ., agree.

Laura is referred to both as Laura Wright and as Laura Lancaster throughout the case. It is not clear whether the parties are or were married.

The affidavit appears to have a scrivener's error where it states that the differential-response case was closed on "12/19/2016" a date which had not yet occurred.

Christopher was on parole.

Being a date yet to have occurred, we treat this as a scrivener's error.

It is not clear whether Laura appeared as the order fails to notate her absence or presence.

The exact nature of the stipulations was not detailed in the order.

Edit in original.

Christopher was present by phone.

Ark. Code. Ann. § 9-27-341(b)(3)(B)(i)(a) (Supp. 2017).

Ark. Code. Ann. § 9-27-341(b)(3)(B)(ii)(a) .

Ark. Code. Ann. § 9-27-341(b)(3)(B)(vii)(a) .

Ark. Code. Ann. § 9-27-341(b)(3)(B)(viii)(a) .

Since the children had come into care, Christopher had become incarcerated for drug-related offenses.

Woodward v. Ark. Dep't of Human Servs. , 2017 Ark. App. 91, at 3, 513 S.W.3d 284, 287 (citing Spangler v. Ark. Dep't of Human Servs. , 2012 Ark. App. 404, 2012 WL 2407145 ).

Id. (citing Watson v. Ark. Dep't of Human Servs. , 2014 Ark. App. 28, 2014 WL 171817 ).

Id. (citing Everett v. Ark. Dep't of Human Servs. , 2016 Ark. App. 541, 506 S.W.3d 287 ).

Id. , at 3-4, 513 S.W.3d 284, 287.

Id. (citing Watson , supra ).

Id. (citing Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 40 S.W.3d 286 (2001) ).

Sutton v. Ark. Dep't of Human Servs. , 2016 Ark. App. 459, at 5, 503 S.W.3d 842, 845-46 (citing Dinkins , 344 Ark. 207, 40 S.W.3d 286 ; Ark. Code Ann. § 9-27-341(a)(3) (Repl. 2015) ).

Watson v. Ark. Dep't of Human Servs. , 2017 Ark. App. 484, at 7, 529 S.W.3d 259, 263 (citing Norton v. Ark. Dep't of Human Servs. , 2017 Ark. App. 285, 2017 WL 1948236 ).

Id.

Id.

Christopher does not contest the circuit court's best-interest finding; the issue is therefore waived. See Del Grosso v. Ark. Dep't of Human Servs. , 2017 Ark. App. 305, at 5, 521 S.W.3d 519, 522.

Lawrence v. Ark. Dep't of Human Servs. , 2018 Ark. App. 223, at 11, 548 S.W.3d 192, 198 (citing Kohlman v. Ark. Dep't of Human Servs. , 2018 Ark. App. 164, 544 S.W.3d 595 ).

DHS's brief unequivocally states that the appellants were not married.

See Hicks v. Cook , 103 Ark. App. 207, 209-10, 288 S.W.3d 244, 246 (2008) ("Arkansas Code Annotated section 9-10-113(a) provides that an illegitimate child shall be in the custody of its mother unless a court of competent jurisdiction enters an order placing the child in the custody of another party. Section 9-10-113(b) provides that a biological father may petition the court for custody if he has established paternity in a court of competent jurisdiction. Custody may be awarded to a biological father upon a showing that (1) he is a fit parent to raise the child; (2) he has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and (3) it is in the best interest of the child to award custody to the biological father.") (internal citation omitted).

Contreras v. Ark. Dep't of Human Servs. , 2015 Ark. App. 604, at 8, 474 S.W.3d 510, 515 (citing Jones-Lee v. Ark. Dep't of Human Servs. , 2009 Ark. App. 160, 316 S.W.3d 261 ); Stockstill v. Ark. Dep't of Human Servs. , 2014 Ark. App. 427, 439 S.W.3d 95 ; see also Anderson v. Ark. Dep't of Human Servs. , 2011 Ark. App. 526, at 9, 385 S.W.3d 373, 380 (citing Sparkman v. Ark. Dep't of Human Servs. , 96 Ark. App. 363, 242 S.W.3d 282 (2006) ("We will not address an argument that DHS failed to make meaningful efforts to reunify the family where the appellant did not appeal from an earlier permanency-planning order finding reasonable efforts.") ).

2016 Ark. App. 459, 503 S.W.3d 842.

Christopher's second incarceration began in September 2016, in Missouri, and he was still incarcerated at the time of the TPR hearing.

Laura does not contest the circuit court's best-interest findings; the issue is therefore waived. See Del Grosso v. Ark. Dep't of Human Servs. , supra.

Knight v. Ark. Dep't of Human Servs. , 2017 Ark. App. 602, at 6, 533 S.W.3d 592, 596 (citing Hambrick v. Ark. Dep't of Human Servs. , 2016 Ark. App. 458, at 12, 503 S.W.3d 134, 140 ; Bowie v. Ark. Dep't of Human Servs. , 2013 Ark. App. 279, 427 S.W.3d 728 ) ("This court will not substitute its own judgment or second-guess the credibility determinations made by the circuit court.").

Willis v. Ark. Dep't of Human Servs. , 2017 Ark. App. 559, at 9, 538 S.W.3d 842, 848 (citing Wafford v. Ark. Dep't of Human Servs. , 2016 Ark. App. 299, 495 S.W.3d 96 ).