KENNETH S. HIXSON, Judge
Appellant Steven Blackwood appeals after the Washington County Circuit Court filed an order terminating his parental rights to B.H. (DOB 11-20-2016).[1] Appellant argues on appeal that the trial court erred in terminating his parental rights because the Arkansas Department of Human Services (DHS) failed to meet its burden of proof and comply with court orders. We affirm.
I. Facts
On January 23, 2017, DHS filed a petition for ex parte emergency custody and dependency-neglect of B.H. In the affidavit attached to the petition, DHS stated that B.H. was removed from his mother's care and custody after it was reported that both Lindsay and B.H. tested positive for opiates, amphetamines, and methamphetamine at B.H.'s birth. The trial court granted the petition, finding that probable cause existed for the removal. The trial court found that there was probable cause to believe that B.H. was dependent-neglected and that it was contrary to his welfare to remain with Lindsay.
*97 Subsequently, a probable-cause hearing was held on January 24, 2017, and the trial court filed a probable-cause order. The trial court found that it was contrary to B.H.'s welfare for him to be returned to his mother's custody. Appellant was referenced in the order as B.H.'s putative father. The trial court noted that Lindsay had not demonstrated stability or sobriety, that B.H. had to remain in the hospital for two months due to his undergoing withdrawal from illegal drugs, and that appellant was incarcerated. In relevant part, appellant was ordered to cooperate with DHS, refrain from using illegal drugs or alcohol, obtain and maintain stable housing and employment that was adequate for him and B.H., demonstrate an ability to protect B.H. and keep him safe from harm, take the appropriate steps to establish paternity, and follow the case plan and court orders.
In the March 22, 2017 adjudication and disposition order, B.H. was found to be dependent-neglected as a result of neglect and parental unfitness. The trial court specifically found that appellant was B.H.'s biological father after appellant had signed an acknowledgment of paternity. The order additionally noted that appellant was incarcerated. An order of paternity was subsequently filed on June 30, 2017.
A review hearing was also held on June 30. The trial court found that B.H. had been diagnosed with fetal alcohol syndrome and had special needs, including the need for intensive supervision and multiple therapies. The trial court further found that
Steven Blackwood has not complied with any of the court orders and the case plan. Specifically, Steven Blackwood remains incarcerated. He was on parole for Manufacturing Methamphetamine and received a Parole Violation for leaving the scene of a personal injury accident. He expects to be out of prison in 6-9 months. He has not maintained contact with DHS; has not demonstrated sobriety; has not demonstrated stability in housing and employment; has not demonstrated that he can protect B.H. and keep him safe from harm. He is in noncompliance.
He has made no progress towards alleviating or mitigating the causes of the juvenile's removal from the home and completing the court orders and requirements of the case plan.
In addition to its previous orders, the trial court ordered appellant to resolve all criminal charges and follow the terms of his probation and/or parole and to participate in the classes available to him in prison. The trial court further declined to place B.H. with his paternal grandmother, Mary Ann Heath. It explained that it had concerns with placing B.H. in her care because B.H.'s stepmother, Steffanie Blackwood, lived in the home and has a felony record; B.H. needed to have continued medical coverage; it was in B.H.'s interest to remain in his current foster home due to his serious special medical needs; and there were three other children already living in the grandmother's home who also had special medical needs. However, the trial court ordered DHS to conduct a home study and did not require Steffanie to move out before the home study was conducted.
After the December 13, 2017 permanency-planning hearing, the trial court changed the goal to adoption and authorized DHS to file a petition for termination of parental rights. The trial court found that neither parent was fit. Regarding appellant, the trial court found the following:
With respect to Father - it is Father's own actions that have caused him to go to prison six (6) times. Father cannot provide for [B.H.] or meet his needs due *98 to Father's incarceration. The Court cannot place [B.H.] with Father today. Father will be incarcerated until at least August of 2018. Father has not made measurable, sustainable progress toward the goal of reunification. The Court notes that incarceration of a parent does not mean that their responsibility to their children stops. Father has a responsibility to provide for [B.H.], but is unable to do so because his choices and actions led to his being incarcerated. Father testified he was denied early parole and will not be released from prison until August 2018 - he is in prison now for a parole violation (his underlying charge is manufacturing of meth).
The trial court noted that it considered a home study on Mary Ann Heath (then Schlosser), but the trial court additionally ordered DHS to conduct a written adoptive home study.
DHS filed a petition for termination of parental rights on February 5, 2018. DHS alleged several grounds for termination under Arkansas Code Annotated section 9-27-341(b)(3)(B) (Supp. 2017) that were applicable to appellant, including the failure-to-remedy, failure-to-provide-material-support or maintain-meaningful-contact, subsequent-factors, criminal-sentence, and aggravated-circumstances grounds. A termination hearing was held on April 4, 2018.
At the termination hearing, the family-service worker assigned to the case, Whitney Muller, testified regarding the case history as outlined above. Muller stated that appellant had shown very minimal compliance throughout the case and had failed to comply with the case plan and court orders. Appellant would write her letters, and she responded with letters encouraging him to engage in services. Muller noted that appellant had been incarcerated throughout the case and that he has seen B.H. only one time in the courtroom. Muller recommended that the trial court authorize B.H.'s adoption after terminating appellant's parental rights. She explained that B.H. was doing well in his foster family's care and that the family had expressed its desire to adopt B.H.
On cross-examination, Muller testified that she had visited B.H.'s paternal grandmother's (Mary Ann Heath's) home once or twice and that she had conducted a home study, which was admitted into evidence. Although the home was appropriate, the home study was not approved because appellant's wife and B.H.'s stepmother, Steffanie Blackwood, was also living in the home. Steffanie is a convicted felon, and DHS would not approve placement into a home with a convicted felon. At one point, Mary Ann told Muller that Steffanie had moved out of the home; however, DHS found that statement to be untrue. Muller acknowledged that the trial court had ordered an adoptive home study after the last hearing, but Muller stated that she was not qualified to conduct an adoptive home study. Regardless, Muller explained that she did not need the adoptive home study in order to give her opinion and recommendation. She opined that it was in B.H.'s best interest to remain with his current foster family. She explained that B.H. requires special care and had bonded with his foster family. B.H. had not developed any relationship with either his father or paternal grandmother outside the courtroom. Further, Mary Ann had other children with special needs already living in her home, and Muller did not think that B.H. would receive the same level of care and attention that he receives in his foster parents' home.
Nirika Morris, an adoption specialist, testified that a contract provider was still in the process of conducting the adoptive home study that was ordered at the previous *99 hearing. She explained that the process took time to complete depending on how long the background checks and references took to complete, which were out of DHS's control. In this case, the information was completed and referred to the contract provider on March 16, 2018, and the contract provider had forty-five days to complete the study. Morris testified that the adoptive home study had not been completed at that time.
Appellant testified that he desired to have B.H. placed in his mother's care until he was released from prison. He explained that he knew his mother would be able to take care of B.H. because she was already caring for three children with special needs. He admitted that he had been incarcerated on at least six or seven separate occasions, stemming in large part from his drug addiction. Appellant explained that he received a ten-year sentence in 1999 and served approximately twenty-three months in prison before being released. Thereafter, he violated his parole only sixty days after his release and served another fourteen months. Appellant further explained that he went back to prison approximately six weeks after that release. He had been convicted of theft by receiving and for "drug-related charges" (methamphetamine). According to appellant, his third stint in prison lasted two and a half years, and once he was released, he stayed out of prison until 2011 when he was charged with manufacturing methamphetamine. Appellant was sentenced to serve twenty years' imprisonment and was paroled in 2014 after serving twenty months. However, he violated his parole for leaving the scene of an accident involving serious injury or death, which led to his current incarceration during the pendency of this case. Appellant stated that the parole board had previously denied his parole request, but he was eligible to request parole again and could be released in August 2018 at the earliest. Appellant further admitted that unless he was granted parole, he could be imprisoned until 2023 under his current sentence.
Mary Ann Heath testified that she is B.H.'s paternal grandmother. During the pendency of the case, Mary Ann married Dave Schlosser. However, at the termination hearing, she testified that she had divorced Dave after they had a disagreement about whether physical discipline would be used against the minor children living in the home. Mary Ann testified that she would not allow physical discipline to be used. She stated that they had been married a total of six months and that they had dated for a year before their marriage. Mary Ann admitted that she was currently raising three children with special needs. She expressed her desire to have B.H. placed in her care because appellant wanted to be a part of his son's life. She stated, however, that she would follow the court's orders and would not allow appellant to see his son if that was the trial court's decision.
B.H.'s foster mother, Pam, testified that B.H. was doing well in her care despite all the complications after his birth. Pam explained that B.H. was in the hospital for two months after his birth and that the doctors had told her that he would have substantial developmental delays. B.H. has multiple therapies and is exceeding expectations. He is walking, using sign language, and has bonded with her. She feared that any abrupt change would be detrimental to him.
In the termination order, the trial court found by clear and convincing evidence that DHS had proved all the statutory grounds alleged. It further found that it was in B.H.'s best interest to terminate appellant's parental rights. It stated that it considered the likelihood that B.H. would *100 be adopted and the potential harm to the health and safety of B.H. by returning him to appellant.
10. The Court finds the following to be true:
a. The Arkansas Department of Human Services has made reasonable efforts to provide services to the family and to finalize the permanency plan in the case. Specifically regarding Mr. Blackwood, the DHS caseworker, Whitney [Muller], has corresponded with him to keep him apprised of the case and how he can participate in it from prison.
....
j. Throughout the case, Steven Blackwood remained incarcerated. He is in the Arkansas Department of Correction. This is his sixth commitment to prison. He failed to establish a home that is safe and appropriate. He failed to demonstrate the ability to care for [B.H.] and support him financially. He did not complete any parenting classes.
k. During the case, neither parent showed an ability to support themselves, much less support the juvenile. Neither parent contributed financially to [B.H.'s] care in the last year.
....
m. Steven Blackwood's criminal record goes back to at least 1999. He has been to prison six times. He was sentenced to 72 months confinement in the Arkansas Department of Correction on May 12, 2017 for leaving the scene of an accident involving serious injury or death. He was on parole for a 240-month sentence for conspiracy to manufacture methamphetamines at the time of the new charge. These sentences are both longer than the time [B.H.] has been alive and are both significant periods of the child's life.
n. Based on the above findings, the Court finds that there is little likelihood of successful reunification with Lindsay Sherry and Steven Blackwood.
....
p. Steven Blackwood has little to no chance of being a significant part of [B.H.'s] life as he has repeatedly acted in ways that led him to be incarcerated. The Court also notes that the only contact between Steven Blackwood and [B.H.] has been a single viewing of the child in the courtroom. He has never been able to care for the child due to his incarceration.
q. The Court is specifically aware of the limitations [B.H.] will face in life based on the testimony and finds that he is still reasonably likely to be adopted as all those issues are being addressed in his therapies.
11. Pursuant to Ark. Code Ann. § 9-27-341, the Court grants the Petition of the Department of Human Services and hereby terminates all parental rights between Lindsay Sherry, Steven Blackwood and the juvenile.
This appeal followed.
II. Standard of Review
A trial court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder *101 a firm conviction as to the allegation sought to be established. Posey v. Ark. Dep't of Health & Human Servs. , 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. Id.
In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. Reid v. Ark. Dep't of Human Servs. , 2011 Ark. 187, 380 S.W.3d 918.
The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. Cobb v. Ark. Dep't of Human Servs. , 2017 Ark. App. 85, 512 S.W.3d 694. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. Id. Finally, a parent's past behavior is often a good indicator of future behavior. Id.
III. Termination
Appellant generally argues on appeal that the trial court erred in terminating his parental rights because DHS failed to meet its burden of proof and comply with court orders. He argues that DHS failed to show by clear and convincing evidence that he is unfit and that termination of his parental rights was in the child's best interests. He analogizes this case to Cranford v. Arkansas Department of Human Services , 2011 Ark. App. 211, 378 S.W.3d 851, and states that the trial court should have placed B.H. with Mary Ann until "he could get out of prison and assume his responsibilities to the child." Appellant alleges that there was no evidence that he had ever harmed the child or that there was a threat he would do so in the future. He further alleges that "DHS did not comply with the court orders and do the adoptive placement home study even though they had plenty of time to do it." He explains that his mother has experience in taking care of children with special needs, that her home was appropriate, and that there "is simply no good reason why the minor child should not have been placed with the grandmother." Appellant contends that if the trial court had done so, he "could have gotten out of prison and continued his efforts toward reunification with the child." Therefore, he argued that *102 termination of his parental rights was not in B.H.'s best interest.
Appellant does not specifically challenge the sufficiency of the evidence supporting the grounds for termination, nor does he specifically challenge the trial court's findings regarding adoptability. Thus, we need not consider those issues. Yarbrough v. Ark. Dep't of Human Servs. , 2016 Ark. App. 429, 501 S.W.3d 839. Nevertheless, subsection (b)(3) of Arkansas Code Annotated section 9-27-341 sets forth the grounds for terminating parental rights and includes the imprisonment ground, which states that "[t]he parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life." Ark. Code Ann. § 9-27-341(b)(3)(B)(vii). The prison sentence, not the potential release date, determines whether this statutory ground is satisfied. Brumley v. Ark. Dep't of Human Servs. , 2015 Ark. 356, 2015 WL 5895440. It was undisputed that appellant had been incarcerated since the birth of his son, and appellant even testified that unless he was granted parole, he could be imprisoned until 2023. Additionally, B.H.'s foster mother indicated that she wished to adopt B.H. Thus, we cannot say that the trial court's findings that appellant's sentence constituted a substantial portion of B.H.'s life and that B.H. was adoptable were clearly erroneous.
Appellant's remaining arguments are without merit. In assessing the potential-harm factor, the court is not required to find that actual harm would ensue if the child were returned to the parent nor to affirmatively identify a potential harm. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. The potential-harm analysis is to be conducted in broad terms. Id. Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. Id. Appellant's analogy to Cranford , supra , is misplaced. In Cranford , we did not agree that termination would necessarily provide greater stability in the child's life because the father had "demonstrated stability in housing and employment before his incarceration, and testified that he will be able to regain that stability after his release, which was anticipated to be only six weeks from the termination hearing." Id. at 10, 378 S.W.3d at 856. Those are not the facts of this case.
Here, regardless of whether the last adoptive home study was available, the fact remained that B.H. was placed in foster care-not the care of a relative. We have repeatedly distinguished and declined to follow Cranford in cases where either the child is not already in a permanent, stable placement or termination is in the best interest of the child. Elliott v. Ark. Dep't of Human Servs. , 2017 Ark. App. 672, 536 S.W.3d 642. Moreover, even if B.H. had been placed in Mary Ann's care, we have held that drug-related issues can support a court's finding of potential harm, even when a child is placed with a relative. Swangel v. Ark. Dep't of Human Servs. , 2018 Ark. App. 197, 547 S.W.3d 111 (citing White v. Ark. Dep't of Human Servs. , 2017 Ark. App. 529, at 6, 530 S.W.3d 402, 405 ).
The case at bar is more akin to Brumley and White . In Brumley , the father had been incarcerated for most of the child's life, had no relationship with the child, and lacked essential components of the case plan as a result of his continued incarceration. Our supreme court held that termination of parental rights was in the child's best interest where the evidence did not reflect any stability or reasonable hope for reunification. Id. Similarly, in White , the father had a series of drug charges dating back to 2009, and his charges and parole violations had led to chronic incarcerations, including his incarceration during the pendency of the dependency-neglect case.
*103 We held that White's own poor choices had led to his arrests and demonstrated the potential harm to his child. Id. The same is true here. Appellant admitted that his drug addiction led to his chronic incarcerations; he had no relationship with his son due to his incarceration during the entire case; he failed to comply with the case plan; and he was ineligible to even seek parole until at least four months after the termination hearing. Clearly, the stability and reasonable hope for reunification found in Cranford is lacking in the facts of the instant case. Permanency is the objective of the termination procedure and cannot be lightly discounted. Brumley , supra . Thus, we conclude that this evidence of potential harm, combined with the child's adoptability, supports the trial court's ruling that termination of appellant's parental rights was in the child's best interest.
Affirmed.
Harrison and Brown, JJ., agree.

The trial court also terminated the parental rights of Lindsay Sherry, B.H.'s mother. However, she is not a party to this appeal.