Cite as 2020 Ark. App. 282

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CV-19-999

LESTER CLONINGER

APPELLANT

V.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILDREN

APPELLEES

**Opinion Delivered:** May 6, 2020

APPEAL FROM THE CONWAY
COUNTY CIRCUIT COURT
[NO. 15JV-18-58]

HONORABLE TERRY SULLIVAN,
JUDGE

AFFIRMED

## RITA W. GRUBER, Chief Judge

Appellant Lester Cloninger appeals from an order terminating his parental rights to CC (07/13/15) and LC (05/26/16).[1] For his sole argument on appeal, he argues that the evidence is insufficient to support the grounds for termination because DHS admittedly offered no services. We affirm.

On October 3, 2018, the Arkansas Department of Human Services (DHS) exercised a seventy-two-hour hold on CC and LC after a visit to the home raised concerns of continued drug use by the parents. DHS filed a petition for dependency-neglect on October 5, 2018, alleging that DHS had been involved with the family since 2016 and that services provided did not prevent removal because the parents continued to use illegal substances and provided an unsafe living environment. The history included a June 2016 true but

---

[1]Jackilyn Cloninger's rights were also terminated, but she is not a party to this appeal.

exempted finding of newborn illegal-substance abuse against Jackilyn and a July 2017 true finding of inadequate supervision against both parents after which a protective-services case was opened. The affidavit of family-service worker Sarah Rion provided that the parents were initially cooperative after the case was opened and appeared to abstain from drug use for several weeks, but then began testing positive for THC. In December 2017 while living with Lester's mother, both parents tested positive for methamphetamine. According to the affidavit, neither parent attended a scheduled drug assessment in the spring of 2018. At a September 25, 2018 visit to the home, Lester's mother informed Rion that she suspected they were using methamphetamine again. Rion returned to the home on October 3 due to the concerns from the previous week in an attempt to provide more services. Her affidavit stated that both parents' drug screens were positive for methamphetamine, amphetamines, and THC. Due to the continued drug use, DHS exercised the seventy-two-hour hold on the children.

On October 5, the circuit court entered an ex parte order placing the children in DHS custody. At the October 12 probable-cause hearing, the parents stipulated that there was probable cause that the emergency conditions that necessitated removal of the children continued such that it was necessary for the children to remain in DHS custody. The order was entered November 13. After a continuance, an adjudication hearing was held on December 13. The court, in the February 14, 2019 order, found that the allegations in the petition were true and correct and accepted the parties' stipulation. The court ordered that the children remain in DHS custody, stating that the parents were unfit and could not protect the safety and health of the children. The court set the goal of reunification and

2

ordered the parents to submit to random drug screens; submit to a drug-and-alcohol assessment and follow any recommendations; obtain and maintain stable and appropriate housing; obtain and maintain stable and gainful employment; submit to counseling; watch "The Clock is Ticking" video; attend and compete parenting classes; cooperate with DHS; and comply with the case plan. The court ordered reasonable visitation at DHS's discretion.

A review hearing took place on March 28, 2019. In the May 16 order, the court found that the children were in need of services and ordered that they remain in DHS custody because the parents were both incarcerated and unfit to care for them. The goal of the case continued to be reunification with a fit and appropriate parent. The court found that DHS had complied with the case plan and court orders and had made reasonable efforts to provide family services and finalize a plan for permanency for the children. The court found that Lester was incarcerated and unable to participate in services.[2]

The court held another review hearing, and the June 24 order provided that the children remain in DHS custody because the parents were incarcerated and unfit to care for them. The court changed the goal of the case to adoption. The court found that DHS complied with the case plan and made reasonable efforts to provide family services and to finalize a permanency plan for the children. The order provided that Lester was again incarcerated and unable to participate in services, noting that he had multiple incarcerations since the case was opened and overall had not complied with, or participated in, the case plan.

---

[2]In addition, the court found that the parties were married when CC was born, that Lester is her biological father, and that he is the parent of both CC and LC under Ark. Code. Ann. § 9-27-303 (Supp. 2019).

3

On August 8, 2019, DHS filed a termination petition on the grounds of subsequent factors and aggravated circumstances. A hearing took place on September 19, 2019.

Brandy Cochran, a supervisor with the Arkansas Division of Children and Family Services who oversaw the case, testified that she had worked closely with the assigned caseworker throughout the case. She explained that when the case began, a protective-services case for drug use had been open for "quite some time." A protection plan was put in place in which Lester's mother would help supervise the children when the parents were under the influence or using a controlled substance. Cochran stated that since the adjudication, DHS had had "very little contact" with the parents, and neither parent had complied with the case plan. Specifically, Cochran said neither parent had submitted to a drug-and-alcohol assessment, obtained stable housing, or submitted to counseling. She added that the only thing completed by either parent was a psychological evaluation, but neither parent attempted to follow up on the recommendations. She said that none of the services had been completed and most services had not even been attempted. She stated that the parents were given visitation, but Lester had visited only about three times, and neither parent had visited since February.

Cochran testified that both parents had substance-abuse problems but neither attempted treatment. She said that Lester had criminal charges and was arrested for terroristic threatening the day the case was opened. Since that time, Lester had also been arrested for possession of drugs and failure-to-appear charges and was incarcerated at the Arkansas Department of Correction at the time of the termination hearing.

4

Cochran recommended termination of parental rights and testified that termination was in the best interest of the children. She stated they are young—three and four—and need stability and permanency, elaborating that DHS has not been able to provide the parents with services "to even get close to having any kind of stability with them." On the basis of her many years of experience, Cochran opined that it would be potentially harmful to the children to be returned to either parent at that time. She explained that Lester was incarcerated and that she was uncertain when he would be released but thought he received a four-year sentence. At the time of the last contact with Lester outside of incarceration, he was still actively using methamphetamine. She stated that if he was imprisoned for a year or longer, it would be a significant portion of the children's young lives, noting that the children had not seen their parents since February.

Cochran was not aware of any issues, either mentally or physically, that would hinder the children from being adopted, indicating that children their age are easily adoptable. Ultimately, Cochran concluded that it would not be safe for the children to return to either parent on the day of the hearing or in the foreseeable future.

On cross-examination by the attorney ad litem, Cochran expressed that there was nothing else DHS could have done to remedy the problems with the parents. She said the parents never gave a reason for their failure to participate in the case plan. When questioned by Lester's attorney, Cochran testified that Lester had not been offered services since he had been incarcerated because there were no services available to him. Cochran explained that the protective-services case was opened when LC was born. She said the current case had

been open for almost a year, and both parents had been incarcerated the majority of the time.

Adoption specialist Monica Cauthen testified that there was no indication CC and LC would have problems with adoption. She added that statistically speaking, children as young as CC and LC are "highly adoptable."

Lester testified that he was aware that his children had been placed in foster care in October 2018 and that there was a case plan. Although he knew the case plan required certain things of him if the children were to be returned, he admitted that he did not follow through, explaining that he "went down the wrong road" and "got involved in drugs and was in trouble." He testified that he was drug-free and incarcerated at the time of the termination hearing. Lester said he was attending parenting and anger-management classes while in prison and anticipated getting certificates by the time he was released. Lester testified he was convicted of possession of methamphetamine, cocaine, and marijuana and received a three-year sentence but thought he would be eligible for parole in November 2019. He admitted that he needed to establish housing and employment, and if given the opportunity, he could start services. He acknowledged that even if the court were to give him a little more time, he still could not successfully reunify with the children in ninety days. Lester added that he would live with his mom when he is released and would receive Social Security disability benefits because of a torn aorta. Lester also acknowledged that he had been incarcerated during most of the case because of drugs. Lester told the court that he was glad he got away from Jackilyn, claiming "she brought me into it."

At the conclusion of the hearing, the court terminated the parental rights of both Jackilyn and Lester. In the order entered October 14, 2019, the court held that the evidence supported the grounds of subsequent factors and aggravated circumstances. As for subsequent factors, the court found that since the beginning of the case, the parents had lived completely unstable lives, had not maintained employment and stable housing, and had failed to complete services in the case plan. The court provided that both parents have had criminal issues involving controlled substances and that Lester was incarcerated at the time of the hearing. With respect to aggravated circumstances, the court found that the children had been subjected to aggravated circumstances and that there is little likelihood that additional services would result in successful reunification. The court referred to Lester's testimony that he had not followed through with the case plan due to his continued drug use, which resulted in his incarceration. The court acknowledged Lester's testimony that Jackilyn led him to drugs but noted that he had not demonstrated any action that he could take to achieve reunification. The court also found that neither parent had visited the children in seven months. In addition to grounds, the court found that it was in the children's best interest to terminate parental rights, specifically finding that the children are adoptable and that they would be subjected to potential harm if returned to either parent. Lester filed a timely appeal from this order.

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2019). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Blackwood v. Ark. Dep't*

7

*of Human Servs.*, 2019 Ark. App. 254, at 9–10, 576 S.W.3d 95, 100–01. On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

Additionally, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). Only one ground is necessary to terminate parental rights. *Wafford v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 299, 495 S.W.3d 96.

Lester's sole argument on appeal is that the evidence is insufficient to support the aggravated-circumstances or subsequent-factors grounds for termination "where DHS admittedly failed to offer services to [him]."[3] We hold that the circuit court did not clearly

[3]Lester does not contest the circuit court's best-interest findings; therefore, the issue is waived. *Lancaster v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 557, at 17, 566 S.W.3d 484, 494.

err in finding that Lester had subjected the children to aggravated circumstances, meaning that there is little likelihood that services to the family will result in successful reunification. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A) & (B)*. Because we conclude that DHS adequately proved aggravated circumstances, we need not discuss the remaining ground found by the circuit court.

In contesting the circuit court's finding of aggravated circumstances, Lester argues that DHS failed to present sufficient evidence "that it made efforts to provide the necessary services to assist [him]." This argument is without merit because a finding of aggravated circumstances does not require DHS to prove that meaningful services toward reunification were provided. *Willis v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 559, at 9, 538 S.W.3d 842, 849 (citing *Draper v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 112, 389 S.W.3d 58). Nevertheless, there must be more than a mere prediction or expectation on the part of the circuit court that reunification services will not result in successful reunification. *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

Lester also contends that DHS failed to prove there was little likelihood that services would result in successful reunification. We disagree. Considering Lester's persistent criminal misconduct for which he was incarcerated for the majority of this case, the proof supported the circuit court's finding that there is little likelihood that services would result in successful reunification between Lester and his children.

Lester contends that in spite of DHS's failure to provide any services during his incarceration, which was almost the entire case, he was able to make progress. He points to his testimony that he is sober, has an established home with his mother upon his release, and

will have sufficient income from Social Security disability. He suggests that the only impediment to reunification was his incarceration. Lester argues that his testimony demonstrated that he could make progress, and that if offered appropriate services, he could successfully reunify with his children. Lester states that at the time of the termination hearing, the children had been in DHS custody less than a year and that he would be released from prison a month after "what would be the year anniversary of the girls' removal." He contends that he should have been given more time, and there was no rush to termination as it related to him, considering that parents are able to receive fifteen months to reunify.

Although Lester testified about when he thought he would be out of prison, the circuit court stated in its oral ruling that Lester received a prison sentence of three years, and although "he may get out earlier . . . we don't know that." Lester has a history with DHS, and a protective-services case had been open since LC's birth in 2016 as a result of the parents' drug use. In 2017, DHS made a referral for drug assessments, which neither parent attended. The parents' continued drug use is what led to the children's removal in October 2018. Lester testified that he was aware there was a case plan that required him to do certain things in order to have the children returned to him. He admitted that he did not do those things because he "got involved in drugs and was in trouble . . . and just went down the wrong road[.]" Lester's continued criminal misconduct and incarceration for the majority of the case are indicative of an impediment to reunification. We affirm the termination of his parental rights based on the circuit court's finding of aggravated circumstances. *See Kohlman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 164, at 11, 544 S.W.3d 595, 601 (affirming termination of parental rights based on aggravated circumstances where

appellant's incarceration for the majority of the case and continued criminal misconduct were indicative of an impediment to reunification).

Affirmed.

SWITZER and HIXSON, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.