2012 Ark. App. 112

**Johnny Dwayne DRAPER and Theresa Draper, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

**No. CA 11–885.**

Court of Appeals of Arkansas.

Feb. 1, 2012.

---

Robert Lamar Depper Jr., El Dorado, for appellant.

Tabitha Baertels McNulty and Keith L. Chrestman, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

Appellants Johnny and Theresa Draper appeal from the order of the Union County Circuit Court terminating their parental rights to their daughter, K.D. (DOB 2/10/96). On appeal, appellants argue that the trial court's decision to terminate was clearly erroneous because the Arkansas Department of Human Services (DHS) failed to offer the family meaningful services in the form of counseling. We affirm.

This case first began on December 8, 2009, when DHS received a child-abuse referral about K.D. According to DHS's affidavit attached to the petition for emergency custody, K.D. and her mother, Theresa Draper, were interviewed that day, and K.D. made the following allegations regarding her adoptive father, Johnny Draper: he required that K.D. leave her bathroom and bedroom doors open; he required that she sleep in a tank top and panties; he watched her while she dressed and changed her clothes; he pulled her shirt up and tickled her when she had no undergarments on; he hugged her in the bathroom when she was naked on multiple occasions; he often slapped her bottom when she washed dishes or rose from her seat; he sometimes used his fingers to examine her vagina to see if she was clean and wiped her vaginal area with a baby wipe; he often kissed her on the mouth at bedtime; and he twice grabbed her breasts while they were riding a four-wheeler. Theresa stated that Johnny only comes into the bathroom when K.D. is naked because K.D. calls him into the room, despite being told not to do so. Theresa further explained that K.D. suffered from bacterial infections in her vaginal area, for which she had sought medical treatment, and that both parents had wiped K.D.'s vagina because of these infections. Theresa indicated that K.D. had recently told her about the sexual abuse allegations and that she immediately confronted her husband, stating that K.D. felt uncomfortable when he hugs her while she is naked. According to the affidavit, K.D. reported that her father was angry and yelled at her when he learned of her allegations, but no further action had been taken by her mother.

DHS took emergency custody of K.D. on December 8, 2009, and probable cause for removal was found at a hearing held on February 9, 2010. The adjudication hearing was held on March 31, 2010. After

hearing testimony by all of the parties, the trial court made the following findings: the testimony of K.D.'s doctor was significant in that she stated that she had never told the parents or K.D. that they needed to clean her vaginal area; the doctor further testified that Theresa had phoned her office on two occasions since K.D. was removed, even requesting a prescription for K.D. that was never given to DHS, and the court stated that it viewed these actions as attempts to justify the touching; the court found it difficult to believe that Johnny was powerless to stop K.D. from calling him into her room or bathroom while she is naked and exchanging hugs, as he claimed in his testimony; the court found from Johnny's testimony that he made a conscious decision to not grab his daughter's side as he was about to fall off the four-wheeler but to instead grab her breasts; the court found the evidence that Johnny was fine with K.D. sitting in the lap of a fifty-something-year-old man and playing with his hair not to be reasonable; from the parents' testimony about Johnny's reaction to his daughter's allegations, which was that he got angry, separated the house into his side and her side, and put rules in place about no tickling and no nudity, the court found that he was trying to punish K.D. for the very behavior that she had been trained to exhibit; the court also noted that there were no photos of K.D. taken outside their hotel room from her and her father's trip to Disney World and that they had shared a bed at Johnny's suggestion.

From all of this evidence, the trial court inferred that Johnny derived sexual gratification from these acts and noted that all of the rules of the house were followed, except for those that happened to put Johnny in a position to see and touch his daughter while naked. The court thus found that K.D. was dependent-neglected based on the findings that Johnny sexually abused her and that her mother knew of the abuse but failed to protect her. The court further found that K.D. had been subjected to aggravated circumstances due to the sexual abuse. The Drapers attempted to appeal the trial court's adjudication order, but their notice of appeal was not timely.

After a hearing held in April 2010, the trial court entered a temporary-custody order, placing K.D. in the custody of her aunt, Chris Hearron, who is her biological father's sister. The Drapers were ordered to follow the case plan and obey all orders of the court, to submit to a psychological evaluation, to attend and participate in individual counseling, to attend and participate in family counseling if recommended, and to obtain and maintain stable employment and housing. Johnny was further ordered to complete a sexual-offender assessment and to follow its recommendations. The Drapers had already completed their court-ordered parenting classes at the time of this hearing. Hearron was instructed to ensure that K.D. also attend individual counseling. The court further ordered that visitation between K.D. and her mother be supervised and that there continue to be no contact with her father.

A petition for termination was filed by DHS on August 2, 2010, and an amended petition was filed on September 23, 2010. It alleged that there were three grounds for termination: (1) the parents had been found to have subjected K.D. to aggravated circumstances; (2) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrated that return of K.D. to the custody of her parents was contrary to her health, safety, or welfare and that, despite the offer of appropriate family services, the parents had manifested an incapacity or indifference to remedy the subse-

quent issues or factors or rehabilitate the circumstances that prevent return of K.D.; and (3) the court had found K.D. dependent-neglected as a result of neglect or abuse that could endanger her life, sexual abuse, or sexual exploitation, any of which was perpetrated by her parent(s) or stepparent(s). The petition further alleged facts supporting termination: the aggravated-circumstances finding; the mother arguing with K.D. at visitations; the parents' failure to provide proof of attending counseling; the mother tape recording her visits with K.D. and hiring a private investigator to follow K.D.; the parents' lack of cooperation with DHS, and their ongoing refusal to accept any blame for the situation; their failure to provide the required documentation to set child support; the mother's constant disruption of the visitations; the parents' failure to allow K.D. to obtain personal items belonging to her from their home; the parents' overt actions to degrade and taunt K.D.; and their failure to comply with all court orders and case plans.

A temporary child-support order was entered on October 18, 2010, directing Johnny to pay $106 per week in child support beginning on October 22, 2010. On December 21, 2010, an ex parte order was entered based upon the attorney ad litem's request, finding that Theresa's visitation should be reduced to biweekly based upon K.D.'s counselor's recommendation. The order stated that the counselor reported an adverse effect on K.D. from the visitations and that irreparable harm would result from continued weekly visits against K.D.'s wishes.

The termination hearing was held on January 31 and February 11, 2011. Lewis Campbell, the psychological examiner, testified that he evaluated both Theresa and Johnny Draper. Regarding Theresa, Campbell stated that there were no signifi-

cant findings, although he noted that she showed a lot of the indications of a passive, dependent personality. His report described Theresa's parenting style as "laissez faire" and stated that it would be difficult for her to be active in the parenting process. For her to have custody of her child, Campbell indicated that Theresa would require counseling to help her with her seizure disorder, which is sometimes debilitating, and to arrange for an appropriate support system. In his evaluation of Johnny, Campbell stated that Johnny seemed to blame K.D. and called her "oppositional." Although there were no significant findings from his tests of Johnny, including the sexual predator assessment, Campbell described the family situation as "out of control" and found that Johnny had made very detrimental choices. Campbell noted that there were serious boundary issues in the family and recommended at the very least that Johnny have counseling in parenting a teenage daughter. He also stated that family counseling involving K.D. would probably be needed.

Stephanie Higgins, a DHS supervisor, testified that K.D. had remained out of the home for fourteen months and that DHS was recommending termination. Higgins stated that there had been five staffing meetings where the case plan was discussed with the parents. At the last staffing meeting in November 2010, Higgins stated that Johnny got very angry and argumentative when discussing the progress that they had made and the sexual-abuse finding by the court. According to Higgins, he stated that the court, DHS, and everyone were wrong and that they would apologize to him when the case had ended. Higgins stated that Johnny's aggressive attitude and behavior had persisted since the beginning of the case and that the parents believed that everyone involved in the case was corrupt. At one staffing, Higgins testified that Johnny

slammed the case plan down on the desk, refused to sign it, and said, "Is this just the same crap? I don't even need to be here." She stated that Johnny continuously called K.D. and DHS "liars." Higgins testified that she had been supervising most of the visits between K.D. and her mother since September 2010, because the staff had become uncomfortable with Theresa's volatile behavior during the visitations. Higgins testified that some of the visits went well but that many of them resulted in nasty arguments between K.D. and her mother. According to Higgins, the issues causing most of the major arguments revolved around the same subjects: Theresa repeatedly referring to Johnny as K.D.'s "Daddy," despite K.D. asking her not to call him that; Theresa's derogatory statements about K.D.'s biological father and family with whom she was currently living in Louisiana; and Theresa's derogatory comments about K.D.'s new school in Louisiana. On several occasions, Higgins stated that the visits ended early because of these arguments.

Higgins testified that DHS had offered services to the family in the form of parenting classes, counseling, supervised visitation, home visits, and psychological evaluations, as well as foster care services, relative placement, and medical physicals offered to K.D. She stated that family counseling had not yet been offered, because the court had instructed that this was only to be done when K.D.'s counselor indicated that she was ready, which had not yet occurred. Despite these services, Higgins stated that there had been no progress made by the parents since K.D.'s removal from the home. While she admitted that the parents had complied with basically all of the case plan and court orders, except for paying child support, she stated that they had just "gone through the motions" and that nothing had changed as far as their attitudes or their family dynamic. She stated that Johnny still did not believe that his conduct was wrong, even after more than a year of services being provided, and that there was no hope of reunification if the parents' attitudes had not changed. Higgins testified that the best thing for K.D. would be to terminate parental rights and move forward to adoption. Higgins stated that the visits were traumatic for K.D., that she fully believes that she was molested by her adoptive father, and that she felt "in limbo." K.D. had indicated on numerous occasions that she did not want to go home as long as Johnny was living there and that she would run away if she were ordered to return home. Higgins also testified that K.D. would not be safe if she were to return home and that, even though she could not say whether Johnny would sexually abuse K.D. in the future, he did continue to have serious boundary issues that had yet to be adequately addressed. Also, Higgins stated that Theresa would be unable to appropriately supervise contact between her husband and daughter. As far as K.D.'s adoptability, Higgins testified that the case had not yet been turned over to the adoption specialist, but that she had personally spoken with someone who would be interested in adopting K.D. She further stated that K.D. did not have serious behavior problems, although she was sometimes argumentative like many teenagers; that she was intelligent and friendly; and that her potential for adoption would be much better than for many other teenagers.

Dr. John Ferguson, the Drapers' therapist whom they sought out on their own, testified that he had been counseling them since June 2010 and that there had been fifteen sessions thus far. According to Dr. Ferguson, the Drapers stated regarding the sexual-abuse finding that K.D. was unwilling to clean herself, that Theresa was

often unable to do it because of her seizure disorder, and that Johnny felt it was his duty to help clean his daughter. Dr. Ferguson testified that he felt Johnny was being earnest in his belief that there was no other option but to assist K.D. himself. He agreed that Johnny had a strong personality and also stated that he had not been able to overcome his anger and frustration at the situation. He opined that Johnny would overcome his anger if there were no longer court involvement. Dr. Ferguson's recommendation was more intensive individual counseling, followed by family counseling when all of the parties were ready. He admitted that this could be a long process, although he stated that it was possible that they would be ready for family counseling within two months if K.D. were to receive twice weekly counseling sessions. Dr. Ferguson agreed that there were some behaviors that needed to be changed for the family to be reunified. He further testified that he did not know if there would even be a "fifty-fifty" chance of reconciliation after additional counseling, but that it was worth giving the family the opportunity.

Tameika McHenry, the DHS caseworker, testified that the majority of the staffing meetings with the Drapers went badly, with the parents often refusing to sign the case plan and stating their intent not to comply unless their attorney told them to do so. She stated that Johnny indicated on several occasions that he was not going to do the counseling as it related to sexual-abuse treatment. During one home visit in February 2010, McHenry stated that Johnny also indicated that he did not think that he would be able to accept K.D. back into the family anymore. McHenry testified that she had not made a home visit since April 2010, when Johnny's aggressive behavior and attitude made her uncomfortable. She supervised the visits between Theresa and K.D. until October 2010 and

agreed that there were both good and bad visitations. McHenry indicated that, on several occasions, K.D. had given her mother a list of items that she wanted from the home and that Theresa continually did not provide those items, sometimes stating that K.D. could have them when she returned home. According to McHenry, she stopped supervising the visitations because of Theresa's overbearing behavior, such as continually accusing her of not holding K.D. responsible for her attitude. McHenry stated that K.D. could act disrespectfully toward her mother sometimes but indicated that she would always correct K.D.'s behavior if her mother did not. She further stated that most of the occasions where K.D. acted disrespectfully toward her mother were when her mother would initiate an argument, such as about K.D.'s weight, her school, or calling Johnny her "Dad." According to McHenry, K.D. had made it clear to her mother during visitations that she did not want to come back home as long as Johnny was there.

K.D.'s aunt and custodian, Chris Hearron, testified that she wished to adopt K.D. and that she had no problems with the child's behavior. Hearron stated that K.D. had never been disrespectful or raised her voice to her. She stated that K.D. had expressed to her that she did not want to go back home with her mother and father, because her mother would not protect her and she was afraid that the same things would happen. After visitations, Hearron testified that K.D.'s demeanor would change depending on how the visit went and that she would often be angry or crying.

K.D. also testified and stated that she wished to be adopted by Hearron. She testified that she was afraid that she would be sexually abused again if she were to return home and that she would not stay

there. K.D. agreed that most of her visitations with her mother did not go well and that she could sometimes be disrespectful to her; however, she stated that her mother would repeatedly bring up subjects that upset her. According to K.D., her mother had told her on several occasions to tell DHS that she had lied, that everything was fine, and that she wanted to come back home. K.D. testified, however, that she had told the truth about what Johnny did to her.

Jayme Walton, a CASA volunteer, testified that she had observed some of the visitations and staffings with the family. Walton stated that a couple of the visitations that she observed went well, but that often there would be degrading comments made by Theresa about K.D.'s appearance that would then lead to an argument. According to Walton, K.D.'s feelings about not wanting to return home had remained the same since the beginning of the case.

Theresa Draper testified that she loved K.D. and wanted her to come back home and that she and her husband had learned a lot from their counseling sessions, such as how to better deal with their communication problems with K.D. Theresa stated that there had not yet been any family counseling provided, and she agreed with Dr. Ferguson that this would be helpful. According to Theresa, she did not agree with the court's finding of sexual abuse because Johnny did not do anything for the purpose of sexual gratification; however, she stated that she now understood that he may have violated boundaries by his conduct and that she would ensure that those things would not happen in the future. She testified that she had never considered possibly separating from Johnny temporarily to regain custody of K.D., as it had not been recommended by her counselor.

The next witness to testify was Johnny Draper, who stated that he had no ill feelings toward K.D., despite her telling lies, and that he still loved her. He stated that he disagreed with the court's finding that he sexually abused K.D. and that nothing he did was wrong or for sexual gratification. After reflection, Johnny indicated that there might have been a better way to deal with some of these issues and that he would not put himself in that position in the future. Johnny testified that he had complied with the case plan and court orders, including counseling. He stated that he and Theresa sought a counselor in Louisiana because they did not trust anyone affiliated with DHS. He admitted that he had not paid any child support but contended that he had not ever been instructed as to the proper amount to pay. According to Johnny, he felt family counseling would first be needed but that he would like to have K.D. return home at some point in the future. When asked what he had learned during the pendency of the case, Johnny testified that "those people that have the power, their opinions matter more than mine do" and that he would not put himself in jeopardy again.

After the hearing, the trial court entered its order terminating the Drapers' parental rights on June 15, 2011. The court found that DHS had proven the following grounds for termination by clear and convincing evidence: (1) that K.D. had been adjudicated dependent-neglected and had continued out of the custody of her parents for more than twelve months and, despite a meaningful effort by DHS to rehabilitate the parents and correct the conditions causing removal, those conditions had not been remedied; (2) that K.D. had lived outside the home for more than twelve months, and the parents had willfully failed to provide significant material support in accordance with their means; and

(3) that the parents had been found by a court of competent jurisdiction to have subjected K.D. to aggravated circumstances.

The trial court also made the following findings of fact and conclusions of law: that, even after seven months of counseling, the parents still had anger issues to overcome before reunification would be possible, and continued court involvement was one of the issues causing the parents' anger; that the parents still blamed K.D.'s behavior for her removal from the home and refused to accept any responsibility for their role in the matter; that the supervised visits with K.D. and her mother were volatile throughout the case, with the mother precipitating most of the arguments; that Johnny never paid any child support despite a court order to do so; that the Drapers' attitude that the court and DHS were wrong and that they deserved an apology continued throughout the case and that the court did not believe that continuing reunification services would change their attitude; that DHS had made reasonable efforts to rehabilitate the parents; and that K.D.'s aunt, Chris Hearron, had indicated that she would be willing to adopt K.D., who did not want to return home with her father present.

The trial court found by clear and convincing evidence that it was in K.D.'s best interest to terminate the Drapers' parental rights and stated that it had specifically considered the likelihood of adoption and the potential harm on K.D.'s health and safety if she were to return home. The court found that K.D. genuinely feared that the abuse would recur and that Johnny's continued refusal to accept any responsibility for the abuse made it likely that emotional and/or sexual abuse would occur if K.D. returned home; therefore, the court found that she would "most certainly" be at risk of potential harm. The

Drapers have timely appealed from the trial court's order of termination.

■ The rights of natural parents are not to be passed over lightly; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). A trial court's order terminating parental rights must be based upon findings proven by clear and convincing evidence. Ark.Code Ann. § 9–27–341(b)(3); *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is defined as that degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established. *Dinkins, supra.* On appeal, the appellate court will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

Pursuant to Ark.Code Ann. § 9–27–341(b)(3) (Repl.2009), an order terminating parental rights shall be based upon a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood of adoption and the potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent. The order terminating parental rights also must be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9–27–341(b)(3)(B).

On appeal, the Drapers' sole argument is that the termination order should be reversed because DHS failed to provide them meaningful services, specifically, additional individual and family counseling. They cite the testimony of Dr. Ferguson, Campbell, and the DHS caseworker, who all stated that reunification would only be possible after individual, and then family, counseling. However, as DHS asserts in its brief, the Drapers fail to challenge the alternative grounds for termination, such as the finding of aggravated circumstances, which does not require that DHS prove that meaningful services toward reunification were provided. Under section 9–27–341(b)(3)(B)(ix)*(a)(3)(B)(i)*, parental rights may be terminated if the trial court has found that the parent subjected the juvenile to aggravated circumstances due to sexual abuse of the juvenile. This particular ground was both pled by DHS in its petition to terminate and relied upon by the trial court in its termination order.[1] In its adjudication order, the trial court found that K.D. had been subjected to aggravated circumstances based on the sexual abuse, and the parents failed to timely appeal this ruling. Thus, there is clear and convincing evidence to support this ground for termination, and only one ground for termination must be proven to support the trial court's decision. *Lee v. Ark. Dep't of Human Servs.*, 102 Ark.App. 337, 285 S.W.3d 277 (2008).

Although not stated as a separate argument, the Drapers also seem to challenge the trial court's finding of best interest, contending that the trial court could not have found that it was in K.D.'s best interest to terminate their parental rights where the "one remaining possible way" of reconciliation was family counseling, which had not been done. The requirement of family counseling was contained in the family's case plan, but only if it was recommended by the individual family member's counselors. According to the DHS supervisor, DHS communicated its desire to K.D.'s counselors that family counseling be provided when it was appropriate. However, at no time did the counselors indicate that K.D. was ready for this. To the contrary, the attorney ad litem sought an ex parte order in December 2010 to reduce the supervised visits with K.D.'s mother because it was impeding her progress in individual therapy, according to a letter sent by K.D.'s counselor. In addition, all of the evidence presented established that the visitations often did not go well and that they frequently dissolved into arguments, usually instigated by K.D.'s mother. K.D.'s custodian testified that these volatile visits adversely affected K.D., leaving her angry and upset. The trial court found that there had been no overall improvement in the visitations in more than one year and that K.D. was in need of permanency. This was supported by the testimony of the DHS supervisor that K.D. felt "in limbo."

The stated intent of the termination statute is to provide permanency in a juvenile's life in all instances in which the return of the juvenile to the family home is contrary to her health, safety, or welfare, and it appears from the evidence that a return home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark.Code Ann. § 9–27–341(a)(3). Given the family's attitudes and lack of progress toward reunification after more than one year of services

---

1. The other two grounds for termination found by the trial court were not alleged in the petition for termination, and therefore, it would not be appropriate for this court to rely on these grounds as support for the termination order. *See K.C. v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 353, 374 S.W.3d 884.

being provided, and the testimony that family counseling would only be appropriate at some future date, the trial court's finding that termination was in K.D.'s best interest was not clearly erroneous. The trial court also specifically considered the likelihood of adoption and the potential for harm if K.D. were returned home in its best-interest analysis. While the Drapers continue to blame K.D. for the instigation of this case in their brief, arguing that she was only manipulating the system to try to separate her mother and father and that she would be in no danger of being harmed if she were to return home, the trial court disagreed, finding that she would "most certainly be at risk of potential harm" if returned to her parents' custody, from emotional and/or sexual abuse. Therefore, the trial court's decision to terminate the Drapers' parental rights is not clearly erroneous, and we affirm.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.