Cite as 2019 Ark. App. 449

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-19-368

| | |
|---|---|
| ALFREDO HERNANDEZ AND JENNIFER HERNANDEZ<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** October 16, 2019<br><br>APPEAL FROM THE GREENE COUNTY CIRCUIT COURT [NO. 28JV-16-314]<br><br>HONORABLE BARBARA HALSEY, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

The Greene County Circuit Court terminated the parental rights of appellants Jennifer Hernandez and Alfredo Hernandez to their two children, A.H. and C.H. The parents have filed separate briefs on appeal. Jennifer challenges each ground for termination and argues that termination was not in the children's best interest. She also argues that the Arkansas Department of Human Services (DHS) failed to make reasonable efforts to reunify her family. Alfredo argues that he was deprived of his due-process rights because he did not have the benefit of counsel until the goal was changed to termination of parental rights. He also contends that DHS did not provide reasonable and meaningful services to him and that there was insufficient evidence that termination was in the children's best interest. We affirm.

I. *Procedural History*

An affidavit attached to a petition for emergency custody and dependency-neglect filed by DHS indicates that a seventy-two-hour hold was taken on A.H. and C.H. on December 16, 2016, because Jennifer had appeared in juvenile court with her younger son and tested positive for buprenorphine, methamphetamine, amphetamines, benzodiazepines (prescription), and THC.[1] Jennifer went to DHS, contesting the drug-screen results from juvenile court, and a drug screen performed by a DHS supervisor was positive for illicit drugs. The affidavit also reveals that DHS first had contact with the family on November 3, 2009 (true referral for inadequate supervision); September 3, 2010 (true referral for threat of harm); November 25, 2009, through December 8, 2010 (successfully completed protective-services case); August 10, 2016 ("inactive referral—unable to locate—for sexual contact"); and October 6, 2016 (true referral for educational neglect).

An ex parte order for emergency custody was entered on December 19, 2016. In an order entered February 7, 2017, the trial court found probable cause that the emergency conditions that necessitated the children's removal from the parent's custody continued to exist. Both parents were ordered to comply with standard welfare orders, including that they cooperate with DHS, comply with the case plan, and obey all court orders; view "The Clock is Ticking" video; remain drug free and submit to random drug screens with the understanding that any refusal to comply or failure to produce a specimen within one hour would be considered a positive result; provide proof of any prescribed medications at the

---

[1]The record reveals that Jennifer and Alfredo are still married but separated, that the children were removed from Jennifer's physical and legal custody, and that the trial court specifically found that Alfredo had played no role in creating the reason for the removal.

time of the random drug screens; participate in and complete parenting classes; obtain and maintain clean, safe, and stable housing with utilities; allow DHS access to their homes; obtain and maintain stable employment or provide sufficient income to support the family; provide DHS with a budget indicating sufficient income or resources to meet the needs of the family; and maintain contact with the caseworker and immediately notify DHS of any change in address, contact information, marital status, or employment status. In addition, Jennifer was ordered to submit to a drug-and-alcohol assessment, to follow the recommendations of the assessment, and to provide a copy of the assessment results to DHS.

On February 10, 2017, A.H. and C.H. were adjudicated dependent-neglected by stipulation of the parents. Specifically, the children were found to have been inadequately supervised due to Jennifer's drug use. The trial court set the goal of the case as reunification and approved DHS's case plan. The parents were again ordered to comply with the standard welfare orders, and Jennifer was required to submit to a drug-and-alcohol assessment. The trial court further ordered that Alfredo was to have no contact with the children for one month. DHS was ordered to press the Arkansas State Police Crimes Against Children Division and the Jonesboro Police Department to investigate the sexual-abuse allegations against Alfredo involving A.H. Moreover, the trial court noted that it had inquired about Alfredo's indigency and determined that an attorney could not be appointed for him.

A hearing was held on March 29, 2017, to review the no-contact order that had been entered against Alfredo. In a limited-review order entered April 27, 2017, the trial court noted that Alfredo had not appeared at the hearing to contest the no-contact order; therefore, the trial court left the order in place.

A review order was entered on June 22, 2017, in which the trial court continued the goal of reunification and found that DHS had made reasonable efforts to provide family services. A permanency-planning order was entered on January 4, 2018, in which the trial court continued the goal of reunification. The trial court gave the parents three more months to work toward the goal of reunification, *not* because the parents had made significant measurable progress, but because the trial court was not satisfied with DHS's provision of services to the parents. The trial court also found that Jennifer had not provided proof of her attendance at NA/AA meetings and had not completed drug-treatment classes recommended by her drug-and-alcohol assessment. The trial court also expressed concern that Jennifer had not allowed DHS access to her home. Further, the trial court found that Alfredo had not complied with the case plan and court orders.

A fifteen-month review order was entered May 11, 2018, in which the trial court changed the goal of the case to adoption. The trial court concluded that both parents had not complied with the case plan and court orders. Specifically, the trial court found that Jennifer had not presented proof of an appropriate home; that she had not provided proof of her attendance at NA/AA meetings; that there was no evidence that she had remedied the cause for the children's removal from her custody; and that she had attended only twenty out of thirty-six recommended drug-treatment classes. As for Alfredo, the trial court noted that, because he had not appeared at the hearing on the no-contact order, he had been given no visitation with his children throughout the case. The trial court appointed counsel to represent each parent.

On August 6, 2018, DHS filed a petition to terminate Jennifer's and Alfredo's parental rights to A.H. and C.H. A termination hearing was held over the course of several days: November 26 and December 6, 2018; and January 11, 2019.

II. *Termination Hearing*

In November, DHS caseworker Ginny Sims, who had been assigned to the case in December 2017, testified that Jennifer had not remedied her drug issues in that she had tested positive for methamphetamine in November 2018. Sims said that there was very little urine to sample, it had "no temperature," and there was something floating in it; she later conceded that, when a sample does not register a temperature, the test is not valid. Sims said that on April 16, 2018, Jennifer refused to submit to a drug screen twice on the same day and that her efforts to perform drug screens had been hampered because Jennifer could not be located at the residence she shared with her father. She testified that she had no idea whether Jennifer's home was appropriate for the children because her father's residence contained a locked bedroom. Sims said that the home was otherwise appropriate but that she had not seen any personal items belonging to a female living there. Sims said that Jennifer had not provided proof of her attendance at drug-treatment classes, which had been recommended from her drug-and-alcohol assessment. Sims said that Jennifer's visits with the children were appropriate for the most part and that she visited more often than not. She said that Jennifer had been diagnosed with bipolar disorder, anxiety, and PTSD but that Jennifer was not attending counseling sessions.

Sims testified that Alfredo had no visits with his children because of the no-contact order. She said that he had completed parenting classes and had watched the video "The

5

Clock Is Ticking"; however, he had not provided proof of stable income, and the home he lived in, where he was renting a room from someone, would not be appropriate for his children. Sims further testified that the children's foster family wished to adopt them and that they are otherwise adoptable in that they do not have major behavioral issues, learning or physical disabilities, or mental or health issues. The remainder of the hearing was continued.

In December, Sims was recalled to the stand. She admitted that she had not visited Jennifer's home every month per DHS policy but explained that she was not always allowed access to Jennifer's home because she conducted random visits. She was cross-examined extensively by Jennifer's counsel about her attempts to visit the home and her communication with Jennifer.

Sims was then cross-examined by Alfredo's counsel about her lack of documentation regarding the case plan; specifically, Alfredo's signature was missing from a copy of the October 2018 case plan. Also, Sims said that she did not think she had provided a copy of that case plan to either Alfredo or his attorney. She later said that she usually emails all of them but that she would have to check her email. Sims stated that on March 12, 2018, she had visited Alfredo's home—a rented room in Jonesboro—and that Alfredo had not given her any information that he had moved from there. She said that the home was obviously not appropriate for two children but that, because of the no-contact order, she had not discussed with him whether the home was appropriate. The remainder of the hearing was continued.

In January, Sims testified that in March 2018 she was aware that Alfredo was not working because he had been injured in a car wreck. She said, however, that he had not notified her of any employment changes. Sims testified that there was a true finding against Alfredo for sexual contact involving A.H. but that she had no information whether Alfredo had been charged with or convicted of any crime related to the sexual-contact allegations.

John Lester, a DHS caseworker assigned to the case in December 2018, testified that in December he had visited the home Jennifer shared with her father and that it was appropriate. He said that he had also given her a drug screen that month, which was negative. Lester stated that, although the case plan involved services for both parents, he had had no contact with Alfredo. He said that, if he were given more time to work with the family, it could make a difference and promote reunification; however, when asked whether the parents had had ample time to work the case, he conceded that most parents do not get two years and that, if DHS was not sure whether the children could be safely returned to either parent, he did not know why additional time would be warranted.

Joshua Everett, therapist for A.H. and C.H., testified that he saw the children weekly. He said that he had family sessions involving Jennifer beginning in December 2017 but that she had begun missing sessions, so they were discontinued in February 2018. He said that he did not feel that the family sessions were in the children's best interest because of Jennifer's repeated absences. He said that he also attempted to have family sessions with Elijah, Jennifer's adult son and the children's brother, but that Elijah was likewise unable to keep appointments. Everett testified that, although the children had expressed their desire to go home with Jennifer, he did not believe the children should be permanently placed

7

with Jennifer because he worried about her mental state. He said that he did not know much about Alfredo. He said that the children's behavioral disorders had been improving but that their anxiety was getting worse because there was no final resolution of the case. Everett said that permanency would help them work through their issues.

Stephanie Hayes, a DHS program assistant, said that she was involved with a drug screen given to Jennifer on December 6, 2018, and that Jennifer tested positive for methamphetamine, amphetamines, benzodiazepines, BUP, and THC. She said that Jennifer wanted the result sent to the lab for confirmation and that she had gotten the results back. Jennifer was positive for those substances.

Alfredo testified that, contrary to his testimony at earlier hearings, he wanted A.H. and C.H. with him. He explained that he had previously said that he wanted them to go with their mother because he had been in a car wreck and was not working. He said that he had participated in services with DHS in that he had completed parenting classes, watched the video "The Clock is Ticking," and attended every staffing of which he had been notified. Although Alfredo initially said that he had given DHS his address and employment status at the staffings, he later said that he had begun working with his cousin in construction in August 2018 but had not provided DHS with proof of income. Alfredo also said that he now lives in a two-bedroom home in Jonesboro with a roommate and that, although he had been living there for four months, he had not given DHS his new address.

Alfredo said that after his car wreck, he did not work for five or six months and that he "didn't really know how to get an attorney appointed to help [him]." He said that, before he was appointed an attorney, he did not know how to ask the court to lift the no-contact

8

order. Although Alfredo said that he did not know why a no-contact order had been put in place, he also explained that he had missed the hearing held to address the no-contact order because he was "pretty upset" and angry. He stated that he had not seen his children since February 2017 and that he had not asked the judge to see his children since March 29, 2017. Alfredo further stated that he understands English but that having someone help him with translating the language would be better.

Jennifer testified that she completed parenting classes, watched the video "The Clock is Ticking," and submitted to a drug-and-alcohol assessment. Jennifer said that, as recommended by the assessment, she had completed thirty-six classes but that she did not provide proof of her attendance because she had received that proof the day before the termination hearing and explained that the treatment provider (Mid-South) had been giving her "the runaround." Jennifer said that she was aware that she was supposed to be attending NA/AA meetings, that she attended NA/AA meetings early on but had stopped, and that she had been attending "Cope Without Dope" once or twice a week since sometime in 2017, which she said was "along the same lines" as Celebrate Recovery. Jennifer stated that, while she had not provided DHS with proof of her attendance at those meetings, she had given the proof to her counsel, who was supposed to have provided it to DHS. Jennifer later said that she had not provided proof of her attendance at NA meetings to DHS because "nobody was ever interested." Jennifer testified that she is "no longer afflicted with a drug problem." Jennifer admitted using marijuana about a month before the termination hearing, but she denied using methamphetamine and insisted that she had last used that drug in February 2017. Jennifer admitted that she had been arrested and charged with misdemeanor

9

possession of a controlled substance at the December 6 hearing. Jennifer stated that she lives with her father and denied ever refusing DHS access to the home but claimed that DHS was supposed to call her and schedule a visit to the home.

Jennifer said that she had a psychological evaluation, that she has bipolar disorder, and that she takes medication for it. She said that she does not currently have a therapist, that she had lost faith in her therapist, and that she instead does yoga and meditation. Jennifer also told the court about her older son, Elijah, who is twenty-two years old. She said that he had lived in the home with A.H. and C.H. and has a good relationship with them.

The trial court accepted a stipulation that A.H. would have testified that he would prefer to be with Jennifer above anyone else, that he would like to live with Elijah if he cannot be with his mother, and that if it is not possible to live with Elijah, he wanted to remain with his foster family. The trial court would not permit Jennifer's counsel to call Elijah and his girlfriend to the stand but allowed their proffered testimony that Elijah has a home and a job and could parent his younger brothers if they were placed with him.

Natalie Gatlin, DHS foster-care supervisor, testified that she did not become involved with the case until after the fifteen-month review. She testified that the children should not be returned to Jennifer's custody because her drug use is still a problem. She said with regard to drug screens, DHS had not been able to consistently get access to Jennifer's home. She also did not recommend that custody of the children be placed with Alfredo because of the no-contact order.

Ronald Brewer, Jennifer's father, confirmed that she has been living with him for six or eight months. He said that he has helped get Jennifer to some of her classes and meetings,

10

that he works and is willing to support the children financially, and that he did not think the children would be in any danger if returned to Jennifer's custody. Brewer said that Jennifer lives with him rent-free but that she keeps the house clean for him.

In its order terminating parental rights, the trial court found three grounds as alleged by DHS in its petition: Ark. Code Ann. § 9-27-341(b)(3)(B)(i) (Supp. 2017) (twelve-month failure to remedy);[2] subdivision (b)(3)(B)(vii) (subsequent factors); and subdivision (b)(3)(B)(ix) (aggravated circumstances—little likelihood). The trial court also determined that termination was in the children's best interest, considering the likelihood that the children would be adopted and the potential harm caused to the children by returning them to the parent's custody.

### III. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Del Grosso v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 305, 521 S.W.3d 519. It is DHS's burden to prove by clear and convincing evidence that it is in a child's best interest to terminate parental rights, as well as the existence of at least one statutory ground for termination. *Id.* On appeal, the inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the appellate court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.* We give a high degree of

---

[2]Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (out of the custody of the parent, i.e., Jennifer) and Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(b)* (out of the home of the noncustodial parent, i.e., Alfredo).

11

deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id*.

The termination-of-parental-rights analysis is twofold; it requires the trial court to find that the parent is unfit and that termination is in the best interest of the children. The first step requires proof of one or more of the nine enumerated statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The best-interest determination must consider the likelihood that the children will be adopted and the potential harm caused by returning custody of the children to the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The trial court, however, does not have to determine that every factor considered be established by clear and convincing evidence. *Spencer v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 96, 426 S.W.3d 494. Instead, after considering all the factors, the evidence must be clear and convincing that the termination is in the best interest of the children. *Id*.

IV. *Discussion*

A. Jennifer Hernandez

1. *Grounds for termination*

Jennifer argues that the trial court erred in terminating her parental rights on the twelve-month failure-to-remedy ground because she had remedied the cause of the children's removal: her drug use. She admits having used marijuana in December 2018 and methamphetamine in February 2017, but she argues that these were just two isolated relapses over a two-year period.

Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* provides as a ground that a juvenile has been adjudicated by the court to be dependent-neglected and has continued

to be out of the custody of the parent for twelve months and that, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent. The children were removed from Jennifer's custody on December 16, 2016, as a result of her drug abuse. They remained out of her custody until the date the termination order was entered, which was January 31, 2019—a period of over two years.

The evidence showed that Jennifer had not remedied her drug abuse despite her statement that she was "no longer afflicted." At the termination hearing, Jennifer admitted having used marijuana about a month before the hearing on January 11, 2019. There was also evidence that Jennifer had tested positive for methamphetamine and other drugs on December 6, 2018, and those results were confirmed by a lab at Jennifer's request. Counsel objected to this testimony on the basis of hearsay and lack of authentication. Jennifer now argues that the trial court abused its discretion in allowing testimony about the lab confirmation of the positive drug screen because it was hearsay not subject to an exception. We review a trial court's ruling on admissibility of evidence under a manifest-abuse-of-discretion standard. *Joslin v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 273, 577 S.W.3d 26. Even if there is judicial error in an evidentiary ruling, we will not reverse unless the appellant demonstrates prejudice. *Id.*

Even if the trial court erred in allowing the testimony, there was no prejudice here because there was other evidence that Jennifer had not remedied her drug abuse without considering the December 2018 drug screen and lab confirmation. Jennifer admittedly used marijuana at a critical time when the trial court would soon reach a decision whether to

13

terminate her parental rights; she used marijuana in spite of attending drug-treatment classes and meetings over a two-year period. This shows Jennifer's indifference to remedying her drug issues. We cannot say that the trial court clearly erred in terminating Jennifer's parental rights based on the failure-to-remedy ground.[3] Because only one ground is necessary to support termination, we do not address the other grounds. *Contreras v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 604, 474 S.W.3d 510.

## 2. *Best interest*

Jennifer argues that DHS did not prove that A.H., who was thirteen at the time of the termination hearing, would consent to an adoption and that he wanted to go home with either his mother or his brother before being adopted by his foster family. Jennifer relies on Ark. Code Ann. § 9-9-206(a)(5) (Repl. 2015), which provides that a petition to adopt a minor over the age of twelve may be granted only if written consent to a particular adoption has been executed by the minor, unless the court in the best interest of the minor dispenses with the minor's consent. This statute, however, does not apply to termination proceedings. *Childress v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 322, 307 S.W.3d 50. It is used only when considering a *particular* petition to adopt a child—not when considering the *likelihood* of adoption. Even if A.H.'s consent were required, the statute also provides that the trial

---

[3]Alternatively, Jennifer argues that the trial court erred by using two isolated relapses to terminate her rights when she had had consistent and appropriate visits with her children; she had a home and could financially support the children; and she had been managing her mental-health needs. Jennifer is essentially asking this court to reweigh the evidence, which we cannot do. *See, e.g., Blasingame v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 71, 542 S.W.3d 873.

court may dispense with that requirement if a particular adoption is in the child's best interest.

Jennifer further asserts that, despite the DHS caseworker's testimony about the boys' adoptability, their counselor testified that they suffer from anxiety and depression and that they have behavioral disorders. Everett testified that the children's behavioral disorders had been improving. He also said that their anxiety likely stemmed, at least in part, from the unresolved nature of the case and that permanency would help them with their issues.

Next, Jennifer argues that there was no potential harm in returning her children to her. She asserts that, despite Sims's testimony, Lester testified that she had clean drug screens and that her home was appropriate. Jennifer says that based on her compliance, lack of drug use, stable housing, and family support, there is no evidence that A.H. and C.H. would be subjected to potential harm. Jennifer is again asking this court to reweigh the evidence, which we cannot do. *Blasingame, supra.* In any event, as discussed at length above, Jennifer's continued use of illegal drugs after two years of drug-treatment classes and meetings represents potential harm to A.H. and C.H. *See, e.g., Jones v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 615, 508 S.W.3d 897.

Jennifer also argues that there was a less restrictive alternative to terminating her parental rights in that the children could have been placed together with Elijah. Jennifer argues that it was error for the trial court to refuse to consider that option. The record reveals that Elijah did not file a motion for leave to intervene and a petition for adoption until *days* before the termination order was entered. Moreover, the children's therapist testified that Elijah had been dropped from the family-therapy sessions, as was Jennifer,

15

because he could not keep appointments. Under these circumstances, we cannot say that the trial court clearly erred in not considering placement with Elijah.

### 3. *Reasonable efforts*

Jennifer argues that, until Lester was assigned to her case, there were few drug screens, not many home visits, and no attempts to ascertain her progress with drug treatment. She argues that DHS did very little throughout the majority of this case. The trial court, however, made several findings that DHS had made reasonable efforts to provide services to Jennifer. There was a point at which the trial court was not satisfied with DHS's efforts and gave the parents three more months to benefit from services. Jennifer did not benefit from those services. DHS provided Jennifer with parenting classes, a drug-and-alcohol assessment, and drug-treatment classes, all of which were geared toward rehabilitating her and correcting the condition that caused the children's removal from her custody. We cannot say that the trial court clearly erred in determining that termination was in the children's best interest.

### B. Alfredo Hernandez

### 1. *Legal representation*

Alfredo argues that a parent has a right to be represented by counsel at all stages of dependency-neglect proceedings and that counsel was not appointed until the goal of the case was changed to termination of parental rights. He argues that, although initially he was found to be not indigent, shortly afterward, he was in a serious car accident and was unable to work. Alfredo argues that neither DHS nor the trial court inquired about his financial status. He maintains that, contrary to *Briscoe v. Arkansas Department of Human Services*, 323

Ark. 4, 912 S.W.2d 425 (1996) (holding that, despite trial court's failure to appoint counsel, error was harmless), there was harm here because DHS had very little contact with him, e.g., he had one home visit and was contacted a few times by telephone. Alfredo states that it would have been "near to impossible" for him to have notified DHS of the change in his employment when his only contact was at staffings. Alfredo also contends that he has a limited understanding of the English language and that additional steps should have been taken to ensure his understanding of how he could seek counsel. Relying on *Buck v. Arkansas Department of Human Services*, 2018 Ark. App. 258, 548 S.W.3d 231, Alfredo further argues that, had he had counsel early on, his attorney could have requested a hearing to address the no-contact order, and he could have been advised of the impact of his testimony that he wanted his children to go back to their mother because it was not that he did not want his children. He argues that he attended the hearings since the probable-cause hearing (except for the no-contact order hearing), that he attended staffings, and that he was included in the case plan.

To the extent Alfredo makes a constitutional due-process argument, Alfredo was afforded due process because an attorney was appointed to represent him after the fifteen-month review hearing because the goal of the case had changed. Therefore, Alfredo had counsel from April 2018 to the termination hearing, which began in November 2018 and ended in January 2019. There was no assertion until the termination hearing that Alfredo misunderstood the process due to his limited understanding of the English language.

As for Alfredo's statutory rights, all parents and custodians have a right to counsel in all dependency-neglect proceedings. Ark. Code Ann. § 9-27-316(h)(1)(A) (Supp. 2017). In

all dependency-neglect proceedings that set out to remove legal custody from a parent or custodian, the parent or custodian from whom custody was removed shall have the right to be appointed counsel, and the court shall appoint counsel if the court makes a finding that the parent or custodian from whom custody was removed is indigent and counsel is requested by the parent or custodian. Ark. Code Ann. § 9-27-316(h)(2)(B). Here, Alfredo was not the parent from whose custody the children were removed. *See Chaffin v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 522, 471 S.W.3d 251. They were removed from Jennifer's custody. This case is not like *Buck*, *supra*, because Buck was living in the home at the time of the children's removal whereas Alfredo could not be located. In the adjudication order, the trial court noted that it could not appoint counsel for Alfredo because he was not indigent. Alfredo may have become indigent afterwards due to a car wreck, but, despite attending all the staffings, he did not notify DHS of his employment status as instructed early on. Pursuant to the statute, Alfredo also had to request that counsel be appointed for him, and there is no indication that he ever requested that counsel be appointed to represent him at the hearings he attended.

## 2. *Reasonable and meaningful services*

Alfredo contends that DHS failed him and did not follow its own policies. He points out that Sims admitted having no signed case plans and that she could not clearly state whether the case plan had been provided to him or his counsel. Alfredo argues that Lester had no contact with him at all, so he could not ask Lester for anything. Sims made one home visit in thirteen months, although she was supposed to have been visiting monthly,

and she did not tell him whether his home was appropriate. Alfredo argues that DHS was not working to reunify him with his children solely because of the no-contact order.

Alfredo does not specifically challenge the grounds for termination, but DHS's provision of family services is an element of proof only in the failure-to-remedy and subsequent-factors grounds. Aggravated circumstances is a ground that does not require that services be offered. *Willis v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 559, 538 S.W.3d 842; *Draper v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 112, 389 S.W.3d 58. The trial court found that there was little likelihood that services to the family would result in successful reunification. Alfredo does not challenge this ground, which does not require that DHS provide reunification services to him. In any event, Alfredo was offered services, but he did not complete parenting classes or watch the video "The Clock Is Ticking" until just before the termination hearing—after the trial court's repeated findings that he had not complied with the case plan. The trial court also found that he had not complied with court orders in that he had not notified DHS of changes in his address and employment status. Further, the no-contact order hindered the provision of services to Alfredo and kept him from seeing his children, yet Alfredo did not seek to have the order lifted despite having been appointed counsel in April 2018. The trial court effectively found that additional time and services would not benefit Alfredo and would not have made any difference in the outcome of this case. We find no error.

3. *Best interest*

Alfredo argues that, although he was not a perfect parent, he had made measurable progress toward remedying the situation and achieving reunification. He argues that at the

termination hearing, he had employment and housing. Alfredo also argues that the trial court did not consider less restrictive alternatives to termination, such as supervised visitation for him.

The trial court did not agree that Alfredo had made progress in the case. He may have had housing and employment, but he had not provided DHS with any proof of it even though he had been ordered from the beginning of the case to keep DHS informed. The trial court did not consider supervised visitation, likely because Alfredo had not appeared at a special hearing to discuss the no-contact order and because it was unclear whether he had asked for visitation after he missed that special hearing. Apparently, the trial court was not even aware that Alfredo wanted custody of his children until the fifteen-month review hearing in April 2018. After that point, Alfredo was appointed counsel, yet he still did not move to lift the no-contact order even though it prevented him from visiting his children for almost two years. We cannot say that the trial court clearly erred in finding that termination of Alfredo's parental rights was in the best interest of the children.

Affirmed.

SWITZER and VAUGHT, JJ., agree.

*Janet Lawrence*, for appellant Alfredo Hernandez.

*Dusti Standridge*, for appellant Jennifer Hernandez.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.